**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-00406 (HHK) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the United States Department of Justice hereby respectfully moves this Court for judgment as a matter of law. The reasons for this motion are set forth in defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment filed herewith.

Dated: January 26, 2007.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

JEFFREY A. TAYLOR
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

ELIZABETH J. SHAPIRO
Assistant Director, Federal Programs Branch

_____/s/ Rupa Bhattacharyya_____
RUPA BHATTACHARYYA (VA# 38877)
Attorneys, Federal Programs Branch
Civil Division, U. S. Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C. 20044
Tel: (202) 514-3146; Fax: (202) 318-7593
Email: rupa.bhattacharyya@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-00406 (HHK) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff in this case, Judicial Watch, Inc., challenges the decisions of three components of the United States Department of Justice ("DOJ" or the "Department") to withhold documents responsive to a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Plaintiff's FOIA request seeks documents from DOJ relating to the Terrorist Surveillance Program ("TSP"), a highly classified intelligence collection program authorized by the President of the United States after the terrorist attacks of September 11, 2001, in order to detect and prevent another catastrophic attack on the United States. The only issue to be decided on this motion is DOJ's response with respect to 294 unclassified documents it identified as responsive to plaintiff's request but withheld under Exemption Five of FOIA, 5 U.S.C. § 552(b)(5), which allows the government to withhold internal documents subject to a claim of privilege.

All of the withheld documents were created following the December 16, 2005, public disclosure of the existence of the TSP by <u>The New York Times</u>, and, broadly speaking, they consist of draft documents discussing the legal basis of the TSP; handwritten attorney marginalia and notes

generated while analyzing the TSP; and electronic mail messages ("emails") among various attorneys and officials in OLC, other components of the Department, and elsewhere in the Executive Branch generated while drafting documents and analyzing legal authorities concerning the TSP.  Because such drafts and internal communications relating to legal analysis are quintessentially documents of the sort protected by the privileges encompassed within FOIA's Exemption Five, DOJ has properly refused to disclose these documents, and has otherwise responded properly under FOIA.  DOJ, accordingly, hereby seeks summary judgment under Federal Rule of Civil Procedure 56.

## BACKGROUND

### 1.  <u>The Terrorist Surveillance Program</u>.

Following the devastating attacks of September 11, 2001, the President of the United States authorized the National Security Agency ("NSA") to intercept international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations (hereinafter, the "Terrorist Surveillance Program" or "TSP").[1]  <u>See</u> Declaration of Steven G. Bradbury, Acting Assistant Attorney General, Office of Legal Counsel ("OLC") ("Bradbury Decl."), attached hereto as Ex. A, ¶¶ 2, 8.  In order to intercept a communication under the TSP, there must be a reasonable basis to conclude that one party to the communication is located outside the United States and that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda.  <u>Id.</u> ¶ 8.  Thus, the TSP is a targeted and focused program intended to help "connect the dots" between known and potential terrorists and their affiliates, <u>id.</u>, and serves as an early warning system established in order to detect and prevent another catastrophic attack on the United States.  <u>Id.</u>  The surveillance capability provided by the

---

[1] The TSP is a highly classified program.  <u>See</u> Executive Order 12958, 60 Fed. Reg. 19825 (Apr. 17, 1995), as amended by Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003) (setting forth the standards for classification and for restricted access to such materials).

TSP is critical to the national security of the United States.[2]  Id.

The President publicly acknowledged the existence of the TSP on December 17, 2005, following the unauthorized disclosure of the highly classified program by The New York Times. Bradbury Decl. ¶ 8.  Thereafter, Department attorneys created a number of documents analyzing, explaining, and defending the TSP's legality.  Id. ¶ 11.  In particular, Department attorneys attempted to identify and articulate the best legal arguments supporting the TSP.  Id.

**2.  Plaintiff's FOIA Requests and DOJ's Responses.**

On January 6, 2006, plaintiff, Judicial Watch, Inc., made a FOIA request to the Department. Plaintiff's request was directed at eight components of DOJ, the Office of Attorney General ("OAG"), the Office of Deputy Attorney General ("ODAG"), the Office of Associate Attorney General ("OAAG"), the Office of Legal Policy ("OLP"), the Office of Intelligence and Policy Review ("OIPR"), the Civil Division, the Criminal Division, and the Office of Legal Counsel ("OLC").[3]  Plaintiff's request sought "any and all records concerning, relating to, or reflecting":

> (1) Any and all legal opinion(s) and/or memorandum(a) regarding the authorization by President George W. Bush for the National Security Agency (hereafter "NSA") to monitor domestic communications without court-approved warrants, referenced in the [December 16, 2005] New York Times story; and
>
> (2) A presidential order signed in 2002 allowing and/or instructing the NSA to

---

[2]  On January 10, 2007, the Foreign Intelligence Surveillance Court ("FISC") issued orders authorizing the Government to target certain international communications for collection. See Bradbury Decl. ¶ 8 n.2.  As a result of these orders, which allow for the speed and agility to intercept such communications effectively, any electronic surveillance that was occurring as part of the TSP is now being conducted subject to approval of the FISC.  Id.  Under these circumstances, the President has determined not to reauthorize the TSP when the current authorization expires.  Id.

[3]  Plaintiff's request was also addressed to the Justice Management Division ("JMD").  JMD did not independently respond, as it serves only as a clearinghouse to ensure that FOIA requests are directed to the appropriate offices.  See 28 C.F.R. § 16.3(a) (authorizing JMD to receive requests where a requester "cannot determine where within the Department to send [a] request," and to "forward [the] request to the component(s) it believes most likely to have the records [sought]").

monitor domestic communications without court-approved warrants, referenced in the [December 16, 2005] New York Times story.

See Bradbury Decl. Ex. A.

Each of the components of DOJ to which plaintiff's request was sent thereafter responded. As a result of negotiations among the parties in an effort to narrow the issues required to be decided by this Court, only the responses of OLC, OIPR and the Civil Division as to certain unclassified documents identified by those components as responsive to plaintiff's requests remain at issue, and thus, only the facts relevant to these components and documents are included herein.[4]

*OLC's Response.*  OLC made its initial response to plaintiff on July 13, 2006, indicating that a search of OLC's unclassified files had been completed and that documents responsive to plaintiff's request had been identified.  Bradbury Decl. ¶ 3 & Ex. B.  At that time, OLC released five documents, totaling 63 pages, and indicated that additional documents were being withheld pursuant to various privileges recognized under FOIA's Exemption Five, including the deliberative process privilege, the attorney work-product doctrine, and the presidential communications privilege.  Id. On August 7, 2006, OLC informed plaintiff that it was withholding two additional unclassified documents pursuant to FOIA Exemption Five.  See id. ¶ 4 & Ex. C.  OLC explained that the two documents were referred from the Department's Civil Division, which had located them in its files while separately processing plaintiff's request.  Id.  In total, OLC withheld from plaintiff 292 unclassified records or categories of records totaling approximately 4,760 pages.

*The Civil Division's Response.*  The Civil Division initially responded to plaintiff's request on January 31, 2006, and advised plaintiff that a search for records had not identified any responsive

---

[4] To the extent plaintiff's complaint is read to state any other claim against a component of the Department, or as to any documents other than those discussed herein, DOJ is entitled to summary judgment as to any such claim, as plaintiffs have determined in the course of the parties' negotiations to pursue only those claims addressed herein.

documents. Declaration of James M. Kovakas ("Kovakas Decl."), attached hereto as Ex. B, ¶ 4 & Ex. C. Plaintiff filed a notice of administrative appeal on March 30, 2006. Id. ¶ 5 & D. Thereafter, the Civil Division undertook a second search for records responsive to plaintiff's January 6, 2006, request, and as a result, identified several responsive records. On April 13, 2006, the Civil Division supplemented its response to plaintiff, identifying documents authored by or originating in other components of the Department, specifically, the Office of Public Affairs, OAG, OLC, and OIPR. Id. ¶ 6 & Ex. E. These documents were referred to those components for direct response. Id. One internal Civil Division email was also identified, which was withheld under Exemption Five. Id.

**OIPR's Response.** OIPR responded to plaintiff with respect to the one unclassified document referred by the Civil Division on September 14, 2006.[5] Declaration of James A. Baker ("Baker Decl."), attached hereto as Ex. C, ¶ 8 & Ex. C. OIPR advised that the document was exempt from disclosure pursuant to Exemption Five of FOIA. Id.

## ARGUMENT

## DOJ IS ENTITLED TO SUMMARY JUDGMENT

The FOIA's "basic purpose" reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989). "Congress recognized, however, that public disclosure is not always in the public interest." Central Intelligence Agency v. Sims, 471 U.S. 159, 167 (1985). The FOIA is designed to achieve a "workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." John Doe, 493 U.S. at 152 (quoting H.R. Rep. No. 1497, 89th Cong., 2

---

[5] The documents referred by the Civil Division to OAG and the Office of Public Affairs, were determined to be not responsive to plaintiff's request by the Department's Office of Information and Privacy. That determination is not challenged by plaintiff.

Sess. 6 (1966), reprinted in 1966 U.S.C.C.A.N. 2416, 2423); see also Am. Civil Liberties Union v. Dept. of Justice , 265 F. Supp. 2d 20, 27 (D.D.C. 2003) (Huvelle, J.) ("FOIA represents a carefully considered balance between the right of the public to know what their government is up to and the often compelling interest that the government maintains in keeping certain information private, whether to protect particular individuals or the national interest as a whole").

To that end, FOIA mandates disclosure of government records unless the requested information falls within one of nine enumerated exceptions, see 5 U.S.C. § 552(b). "A district court only has jurisdiction to compel an agency to disclose improperly withheld agency records," i.e., records that do "not fall within an exemption." Minier v. Central Intelligence Agency, 88 F.3d 796, 803 (9th Cir. 1996) (emphasis by the court); see also 5 U.S.C. § 552(a)(4)(B) (providing jurisdiction only to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld. . . ."); Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 150 (1980) ("Under 5 U.S.C. § 552(a)(4)(B)[,] federal jurisdiction is dependent upon a showing that an agency has (1) 'improperly' (2) 'withheld' (3) 'agency records.'"). Despite the "liberal congressional purpose" of FOIA, the statutory exemptions must be given "meaningful reach and application." John Doe, 493 U.S. at 152. "Requiring an agency to disclose exempt information is not authorized. . . ." Minier, 88 F.3d at 803 (quoting Spurlock v. Fed. Bureau of Investigation, 69 F.3d 1010, 1016 (9th Cir. 1995)).

The government bears the burden of proving that the withheld information falls within the exemptions it invokes. 5 U.S.C. § 552(a)(4)(b). Summary judgment should be granted if the movant has shown, when the facts are viewed in the light most favorable to the nonmovant, that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Greene v. Dalton,

164 F.3d 671, 674 (D.C. Cir. 1999).  A party opposing a motion for summary judgment "may not

rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing

that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)

(quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).  In a FOIA case,

the court may award summary judgment to an agency on the basis of information provided in

affidavits or declarations that describe "the documents and the justifications for nondisclosure with

reasonably specific detail, demonstrate that the information withheld logically falls within the

claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith."  Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir.1981).

    Given these standards of review, as the discussion below and the accompanying declarations

demonstrate, all of the information withheld by DOJ here plainly falls within exemptions to FOIA's

disclosure requirements.   DOJ is thus entitled to summary judgment.

**DOJ Properly Withheld Records under FOIA's Exemption Five.**

    This motion seeks summary judgment with respect to DOJ's determination to withhold 294

document under FOIA.  Of these, as described above, 292 were withheld by OLC, one was withheld

by the Civil Division, and one was withheld by OIPR.  All of the documents were withheld pursuant

to Exemption Five of FOIA.[6]  Exemption Five allows the agency to withhold "inter-agency or intra-

---

[6] As described by Mr. Bradbury, to the extent the documents contain information such as the
names of third-party individuals (non-government employees) and OLC and other government
agency staff, as well as their personal information, such as addresses (including email addresses),
home telephone numbers, or cellular phone numbers, such information is also properly exempt from
disclosure under Exemption Six, 5 U.S.C. § 552(b)(6), which protects information that cannot be
disclosed without resulting in an unwarranted invasion of personal privacy.  See Bradbury Decl. ¶
27; see also Baez v. Dept. of Justice, 647 F.2d 1328, 1339 (D.C. Cir. 1980) ("government officials
have a legitimate interest in preserving the secrecy of matters that conceivably could subject them
to annoyance or harassment in either their official or private lives"); Lesar v. Dept. of Justice, 636
F.2d 472, 487 (D.C. Cir. 1980) (same); Hunt v. Fed. Bureau of Investigation, 972 F.2d 286, 288 (9th
Cir. 1992) (government employees have "legitimate interest in keeping private matters that could

agency memorandums or letters which would not be available by law to a party other than agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption Five ensures that members of the public cannot "obtain through FOIA what they could not ordinarily obtain through discovery undertaken in a lawsuit against the agency." <u>Schiller v. Nat'l Labor Relations Bd.</u>, 964 F.2d 1205, 1208 (D.C. Cir. 1992) (citation omitted). As a result, Exemption Five "exempt[s] those documents . . . normally privileged in the civil discovery context." <u>Id.</u> (citations omitted)).

Each of the documents withheld is internal to the Department or to the Executive Branch and was not shared outside the Executive Branch. <u>See</u> Bradbury Decl. ¶ 17; Kovakas Decl. ¶ 7; Baker Decl. ¶¶ 10-11. Each, moreover, is subject to the protection of one, or more, of the ordinary litigation privileges available to DOJ, specifically, the deliberative process privilege, the attorney-work product doctrine, and the presidential communications privilege.

*__The Deliberative Process Privilege.__* Documents covered by the deliberative process privilege include those "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." <u>Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.</u>, 421 U.S. 132, 150 (1975) (citation omitted); <u>accord</u> <u>Coastal States Gas Corp. v. Dept. of Energy</u>, 617 F.2d 854, 866 (D.C. Cir. 1980) (deliberative process protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency"). As the Supreme Court has explained:

---

conceivably subject them to annoyance or harassment."); <u>See</u> <u>Voinche v. Fed. Bureau of Investigation</u>, 940 F. Supp. 323, 330 (D.D.C. 1996) ("[T]here is no reason to believe that the public [would] obtain a better understanding of the workings of various agencies by learning the identities of" the individuals associated with the documents), <u>aff'd</u>, 1997 WL 411685 (D.C. Cir. 1997); <u>Schwarz v. Dept. of the Treasury</u>, 131 F. Supp. 2d 142, 150 (D.D.C. 2000) (Kennedy, J.) (disclosure of federal employees' names contained in federal records "would not contribute to the public understanding of government functions").

> The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.

Dept. of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001) (internal quotation marks and citations omitted); accord Russell v. Dept. of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982).

FOIA's inclusion of the deliberative process privilege among its exemptions "reflect[s] the legislative judgment that the quality of administrative decision-making would be seriously undermined if agencies were forced to 'operate in a fishbowl' because the full and frank exchange of ideas on legal or policy matters would be impossible." Tax Analysts v. Internal Revenue Serv., 117 F.3d 607, 617 (D.C. Cir.1997); see also Nat'l Labor Relations Bd., 421 U.S. at 150 (explaining that the deliberative process privilege is intended to encourage frank discussion of "legal or policy matters" and to protect the "decisions and policies" resulting from these deliberations); EPA v. Mink, 410 U.S. 73, 87 (1973) (explaining "efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to operate in a fishbowl") (internal quote omitted).  Thus, the fundamental purpose of the privilege is "to protect the deliberative process itself, not merely documents containing deliberative material," Mapother v. Dept. of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993, and "the key question" in cases under the privilege is "[to] focus less on the nature of the materials sought and more on the effect of the materials' release," i.e., "whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions."  Dudman Communications Corp. v. Dept. of the Air Force, 815 F.2d 1565, 1568 (D.C. Cir. 1987).

A document must be both "predecisional" and "deliberative" to qualify for the deliberative process privilege. In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997) (citations omitted). "To establish that a document is predecisional, the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role that the documents at issue played in that process." Judicial Watch v. Export-Import Bank, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (Lamberth., J.) (citation omitted). A record is "deliberative" when "it reflects the give-and-take of the consultative process." Wolfe v. Dept. of Health & Human Servs., 839 F.2d 768, 774 (D.C. Cir. 1988) (citation and internal quotation marks omitted) (en banc).

"There should be considerable deference to the [agency's] judgment as to what constitutes . . . 'part of the agency give-and-take – of the deliberative process – by which the decision itself is made.'" Chemical Mfrs. Ass'n v. Consumer Prod. Safety Comm'n, 600 F. Supp. 114, 118 (D.D.C. 1984) (Oberdorfer, J.) (quoting Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975)). This is because the agency is best situated "to know what confidentiality is needed 'to prevent injury to the quality of agency decisions . . . .'" Chemical Mfrs., 600 F. Supp. at 118 (quoting Nat'l Labor Relations Bd., 421 U.S. at 151); accord Pfeiffer v. Central Intelligence Agency, 721 F. Supp. 337, 340 (D.D.C. 1989).

As is clear from a review of the declarations filed in support of defendant's motion for summary judgment and the exhibits filed in support thereof, the unclassified documents withheld by DOJ are drafts, related deliberative exchanges, and attorney notes, all of which fall squarely within the protection of the deliberative process privilege. See Bradbury Decl. ¶¶ 6, 12; Kovakas Decl. ¶ 7; Baker Decl. ¶ 8. As Mr. Bradbury describes, following the public disclosure of the TSP by The New York Times on December 16, 2005, and the President's public acknowledgment of the program on December 17, 2005, the Office of Legal Counsel and other components of the

Department attempted to identify and articulate the best legal arguments supporting the TSP and created a number of documents analyzing, explaining, and defending the TSP's legality, see Bradbury Decl. ¶ 11, including a December 22, 2005, letter to members of Congress, signed by Assistant Attorney General for the Office of Legislative Affairs, William E. Moschella, and a 42-page January 19, 2006, memorandum issued by the Department entitled "Legal Authorities Supporting the Activities of the National Security Agency Described by the President," known as the "White Paper."

All of the withheld documents are deliberative, pre-decisional documents that reflect the internal deliberations about the legal arguments supporting the TSP that occurred during this period; some are drafts;[7] many others reflect internal communications (emails or facsimile transmissions) within OLC and/or with other components of the Department or others within the Executive Branch about the content or preparation of the drafts,[8] or otherwise conveying attorneys' individual views

---

[7]  See, e.g., Bradbury Decl. Ex. E, Document Nos. 26, 289 (drafts of the Moschella letter); Nos. 34, 35, 36, 38, 39, 41, 280, 281 (drafts of the White Paper or other substantive legal analysis of the TSP); Nos. 21, 25, 27, 31, 35, 37, 279, 282, 287, 288 (talking points or draft talking points); No. 17, (draft legislation); Nos. 40, 283, 286, 292 (draft Attorney General statements); No. 285 (draft of USA Today editorial published by Associate Attorney General Robert McCallum); Nos. 290, 291 (draft responses to press or congressional questions).

[8]  See, e.g., Bradbury Decl. Ex. E, Document Nos. 9, 15, 22, 28, 30, 36, 42, 43, 44, 45, 46, 50, 51, 53, 54, 55, 57, 60, 61, 64, 65, 71, 72, 75, 76, 77, 78, 79, 80, 81, 85, 86, 87, 88, 94, 95, 96, 97, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 118, 119, 120, 121, 122, 123, 125, 126, 129, 134, 139, 143, 144, 162, 171, 172, 175, 176, 178, 179, 180, 182, 183, 184, 185, 186, 187, 188, 190, 191, 192, 193, 194, 195, 196, 197, 198, 202, 203, 204, 205, 206, 207, 208, 212, 213, 214, 215, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 228, 231, 232, 233, 234, 236, 237, 238, 239, 240, 241, 246, 247, 248, 250, 251, 252, 254, 255, 256, 262, 267, 268, 269, 270, 271, 272, 273, 275, 277, 278; Kovakas Decl. ¶¶ 7-8; Baker Decl. ¶ 8 (internal communications regarding preparation of White Paper or addressing other substantive legal analysis of the TSP); Nos. 12, 47, 55, 58, 82, 83, 84, 135, 140, 147, 150, 151, 153, 156, 157, 158, 160, 161, 164, 165, 177, 181, 245 (internal communications regarding preparation of Moschella letter); Nos. 1, 2, 6, 14, 29, 48, 49, 56, 70, 73, 74, 89, 90, 91, 92, 93, 98, 99, 100, 117, 124, 132, 133, 137, 138, 141, 142, 145, 148, 149, 153, 154, 155, 157, 159, 160, 161, 163, 164, 166, 167, 168, 169, 170, 173, 174, 189, 199, 201, 209, 227, 249, 257, 258, 259, 261, 265, 276 (internal communications regarding preparation of talking

regarding the TSP for consideration during the process of analyzing the legality of the TSP;[9] or are

handwritten notes and annotations made by OLC attorneys as they prepared or considered draft

documents.[10]  Each of these documents qualifies for the deliberative process privilege.

First, as courts have recognized, "[d]raft documents by their very nature, are typically

predecisional and deliberative."  Exxon Corp. v. Dept. of Energy, 585 F. Supp. 690, 698 (D.D.C.

1983); see Bradbury Decl. ¶¶ 13-17; see also Dudman Communications Corp., 815 F.2d at 1568-69;

City of Virginia Beach v. Dept. of Commerce, 995 F.2d 1247, 1253 (4th Cir. 1993); Town of

Norfolk v. U.S. Army Corps of Engineers, 968 F.2d 1438, 1458 (1st Cir. 1992).  Here, the draft

documents concern prior versions of the White Paper, the Moschella letter, talking points, and other

documents that reflect the back-and-forth of agency decision-making as the Department of Justice

considered which legal arguments would best articulate and defend the TSP.[11]  See note 5, supra;

Bradbury Decl. ¶ 16; see also id. ¶ 15 ("Inevitably, initial drafts of documents differ substantially

---

points); Nos. 66, 130, 253, 260 (internal communications regarding preparation of Attorney General
or Presidential statements); Nos. 69, 235 (internal communications regarding preparation of USA
Today editorial published by Associate Attorney General Robert McCallum); Nos. 23, 32, 33, 52,
59, 62, 63, 67, 68, 127, 128, 131, 136, 200, 210, 211, 229, 230, 242, 243, 244, 263 (internal
communications regarding proposed responses to congressional or press inquiries); Nos. 216, 266
(internal communications regarding potential legislation).  Many of these internal communications
are electronic mail messages that attach drafts; while the email messages are logged separately, the
attachments are considered part of the document for purposes of assessing the application of the
asserted privileges.

[9] See, e.g., Bradbury Decl. Ex. E, Document Nos. 16, 24, 146, 152, 264, 270, 274.

[10] See, e.g. Bradbury Decl. Ex. E, Document Nos. 3, 4, 5, 7, 8, 10, 11, 13, 16, 18, 19, 20, 26,
28, 30, 31, 34, 35, 40, 41, 75, 110, 228, 233, 248, 277, 278, 284 (all reflecting attorney notes,
annotations, and/or marginalia).

[11] Indeed, even final talking points are no more than suggestions for the eventual speaker and
reflect no more than the advice of those asked to prepare them.  Thus, documents like No. 27 also
are subject to protection under the deliberative process privilege.

from the final version, as attorneys adjust their analysis in response to input from their colleagues").[12]

As Mr. Bradbury explains, "creating draft documents is an integral part of the deliberations within OLC, the Department, and the Executive Branch."  Bradbury Decl. ¶ 14.

> Through the writing process, OLC attorneys focus, articulate, and refine their advice and analysis.  Drafts do not represent the final position or ultimate views of the Office, the Department, or the Executive Branch.  To the contrary, drafts are, by their very nature, pre-decisional and deliberative.  They are part of the exchange of ideas and suggestions that accompanies all decisionmaking, and they reflect the preliminary assessments and suggestions of OLC attorneys.

Id.; see also Baker Decl. ¶ 9 ("Part of the deliberative process involves the creation of draft documents which are then reviewed, edited, and modified before they become final.  By their very nature as drafts, these documents are preliminary versions of what may later become a final document").

Disclosure of such documents would "inevitably, reveal changes and revisions made by OLC and the Department during the deliberative process," Bradbury Decl. ¶ 16, and thus would fundamentally compromise the manner in which personnel throughout the Department fulfill their responsibilities to review, advise, and consult with respect to the ongoing operations of the Executive Branch.[13]  Id. ¶¶ 16-17; see also Baker Decl. ¶ 11; Dudman, 815 F.2d at 1569 (disclosure of

---

[12]  It is thus irrelevant that the TSP itself was a policy admittedly implemented by the NSA years before these documents were created.  The unclassified materials withheld here do not relate to the decision to adopt or implement the TSP, but rather to subsequent decisions that became necessary after the unauthorized public disclosure of the TSP as to what analysis and legal argument the Department might publicly put forward to best articulate and defend the program.  Just as an agency's general counsel's decision that a particular agency policy is lawful does not deny the protection of the deliberative process privilege to subsequent decisions made about how to defend the policy in litigation following its implementation, so too here, the Department's decision-making as to the composition, content and structure of the White Paper and other legal analyses of the TSP are entitled to protection.

[13]  That some of the materials may have been prepared to aid public comment is irrelevant to the assertion of the deliberative process privilege.  To the extent that DOJ officials ultimately relied on any of the draft talking points or draft responses to congressional inquiries, or released a

"decisions to insert or delete material or to change a draft's focus or emphasis – would stifle the creative thinking and candid exchange of ideas necessary to produce good historical work"); Russell, 682 F.2d at 1048 ("[i]f the authors [of draft documents] are put on notice . . . that each and every difference of opinion will be revealed to the public, with possible adverse consequences to the [agency], they will be less inclined to state their own interpretations candidly where they perceive the possibility of differences from the opinions held by the reviewing authorities.  Stated otherwise, they will be more inclined to draft what they perceive the "official line" to be"; moreover, "disclosure of [] withheld pages of [] draft manuscript could lead to confusion of the public" ).

Second, and for many of the same reasons, the disclosure of deliberative exchanges made via email relating to the resolution of issues raised by any matter being actively considered by the Department would inhibit the full and fair exchange of ideas and recommendations that is necessary to the formulation of Executive Branch policy and would markedly alter the process by which such policies are made.  See note 6, supra; Bradbury Decl. ¶¶ 18-20; Kovakas Decl. ¶¶ 7-8; Baker Decl. ¶¶ 10-12.  In particular, email is used by Department attorneys to "engage in 'back and forth'

---

final, public, version of any document, those statements are, by definition, public.  The agency's decision to rely on a particular point in defense of its position is therefore reflected in the public record, and plaintiffs do not need access to the drafts to know what that position is:

> If the segment appeared in the final version, it is already on the public record and need not be disclosed. If the segment did not appear in the final version, its omission reveals an agency deliberative process: for some reason, the agency decided not to rely on that fact or argument after having been invited to do so . . . . [S]uch disclosure of the internal workings of the agency is exactly what the law forbids.

Lead Indus. Ass'n, Inc. v. OSHA, 610 F.2d 70, 86 (2d Cir. 1979).  Indeed, both this Court and the Court of Appeals have recognized that the process of preparing documents for public consumption is protected by the deliberative process privilege.  See Judicial Watch, Inc. v. Reno, 2001 WL 1902811, at *3 (D.D.C. 2001) (Robertson, J.) (deliberations regarding "what litigation positions to adopt . . . , what position to take on possible Congressional responses . . . , and how to handle press inquiries and other public relations issues" are protected); see also Krikorian v. Dept. of State, 984 F.2d 461, 465-66 (D.C. Cir. 1993) (deliberations regarding "how the [agency] should respond to the reaction of some members of the public . . ." are protected).

discussions, just as they might in a face-to-face meeting or when walking down the hall." Bradbury Decl. ¶ 18. Thus, Department emails discussing the substance of documents being created "reflect a fluid and evolving exchange of ideas," id., and are integral to the efficient and effective operation of the Department's deliberative process.

As Mr. Baker explains, releasing email messages which contain "commentaries on and discussions of the draft White Paper, including suggestions and opinions regarding its content . . . . would chill the free flow of opinions within the Executive Branch." Baker Decl. ¶ 10; see also Bradbury Decl. ¶¶ 18-19 ("OLC and Department attorneys routinely send and receive e-mails that convey preliminary advice, analysis, and reactions to a legal issue or question in a substantive but informal manner. . . . Forcing the production of these quintessentially deliberative and preliminary documents would impair decisionmaking by discouraging OLC attorneys from candidly and freely exchanging information and ideas with their colleagues while examining complicated legal issues"); see also Baker Decl. ¶ 11 (describing, as to OIPR document, that "[d]isclosure of this record would prevent staff who prepare drafts and participate in the deliberative process from freely expressing their recommendations and giving advice about the legal basis for the Administration's program. . . . This inhibition would be extremely detrimental to the Attorney General and Deputy Attorney, who rely on such advisors for their complete candid opinions"); Kovakas Decl. ¶ 7 (describing the withheld Civil Division document).

Third, the disclosure of handwritten attorney notes and comments would similarly compromise the process of making decisions about how to best articulate the legal basis for a particular program, here the TSP, and thus harm the Department's deliberative process. As Mr. Bradbury explains, the withheld attorney notes, see notes 7 & 8, supra, "contain attorneys' informal views and preliminary thoughts and reactions, and they are vital to the careful and thoughtful

development of the Office's advice.  Compelling their release would greatly harm OLC's deliberative processes by discouraging attorneys from placing their initial thoughts and reactions on paper."  Bradbury Decl. ¶ 20; see Judicial Watch of Florida, Inc. v. Dept. of Justice, 102 F. Supp. 2d 6, 12-15 & n.7 (D.D.C. 2000) (Urbina, J.) (handwritten notes appropriately withheld because notes are related to decisionmaking process) (citing cases); see also United States v. Nixon, 418 U.S. 683, 705 (1974) ("U.S. v. Nixon") ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process").  Markings and marginalia made by attorneys in the course of their work are equally critical to the deliberative process.  See Bradbury Decl. ¶ 20 ("markings reflect attorneys' individual mental impressions and evaluations, and the markings highlight important sections of documents for future reference.  Disclosing these private markings would inevitably reveal the Department's internal deliberations").

As the declarations clearly establish, accordingly, all of the documents withheld by OLC, OIPR and the Civil Division are protected from disclosure by the deliberative process privilege.  Their "compelled disclosure . . . would cause serious harm to the deliberative processes of the Department of Justice and the Executive Branch. . . . It is essential to the mission of the Executive Branch that OLC's legal advice, and the development of that advice, not be inhibited by concerns about public disclosure." Bradbury Decl. ¶ 22.  These documents, accordingly, are properly withheld under FOIA's Exemption Five.

***The Attorney Work Product Doctrine.***    In addition to the deliberative process privilege, many of the documents withheld are also subject to protection from disclosure under the attorney-work product doctrine.  The attorney-work product doctrine prevents the disclosure of "documents prepared in anticipation of foreseeable litigation, even if no specific claim is contemplated."

Schiller, 964 F.2d at 1208.  It applies so long as "some articulable claim, likely to lead to litigation"

has arisen.  Coastal States, 617 F.2d at 865.  The doctrine, thus, protects information generated by

legal counsel where "the document can fairly be said to have been prepared or obtained because of

the prospect of litigation."  In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998)

　　　　In particular, the work product doctrine shields activities designed to forestall or prevent

litigation, or to prepare for anticipated litigation, so as to further the interests of justice.  Thus, the

Court of Appeals has noted:

> [i]t is often prior to the emergence of specific claims that lawyers are best equipped either to help clients avoid litigation or to strengthen available defenses should litigation occur. . . . If lawyers had to wait for specific claims to arise before their writings could enjoy work-product protection, they would not likely risk taking notes about such matters or communicating in writing with colleagues, thus severely limiting their ability to advise clients effectively. . . . Discouraging lawyers from engaging in the writing, note-taking, and communications so critical to effective legal thinking would . . . "demoraliz[e]" the legal profession, and "the interests of the clients and the cause of justice would be poorly served."

In re Sealed Case, 146 F.3d at 886 (quoting Hickman v. Taylor, 329 U.S. 495, 511 (1947)).  Because

the doctrine serves to protect such critical interests, the Court of Appeals has specifically instructed

that "the doctrine should be interpreted broadly and held largely inviolate."  Judicial Watch, Inc. v.

Dept. of Justice, 432 F.3d 366, 369 (D.C. Cir. 2005).  Thus, "[a]ny part of [a document] prepared

in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like,

is protected by the work product doctrine and falls under exemption 5."  Id. (quoting Tax Analysts,

117 F.3d at 620).

　　　　Many of the documents withheld here, including the document withheld by the Civil

Division, see Kovakas Decl. ¶ 9; the document withheld by OIPR, see Baker Decl. ¶¶ 13-14 9; and

many of the documents withheld by OLC, see Bradbury Decl. Ex. E (identifying documents subject

to the attorney work product privilege with the identifier "WP"), are subject to the protection of the

work-product doctrine, and thus, are properly withheld under Exemption Five. As Mr. Bradbury explains, "after public disclosure of the TSP by the <u>New York Times</u> . . . OLC and the Department immediately expected that . . . third-parties would file lawsuits challenging [the TSP]. Consequently, OLC attorneys drafted, reviewed and deliberated on these documents not only with the goal of articulating arguments in support of the TSP's legality, but also in contemplation of anticipated litigation."[14]  Bradbury Decl. ¶ 24.  Thus, as Mr. Bradbury continues, "[e]ach of the documents withheld under the work product doctrine reflects attorneys' thoughts, impressions, and legal analysis of arguments that OLC and others believed might arise in the expected litigation."  <u>Id.</u>; <u>see also</u> Kovakas Decl. ¶ 9 (explaining that, as to the Civil Division document, "the document reflects an attorney's thoughts about a legal issue in the drafting of a "white paper" prepared in anticipation of litigation. . . . As such, the document reflects the preparation of Department attorneys in anticipated litigation and clearly falls within the traditional meaning of attorney work product"); Baker Decl. ¶ 13 (explaining that, as to the OIPR document, "[d]isclosure of this email, which contains internal suggestions regarding drafting of the White Paper," which was "created in anticipation of litigation, and [where] litigation was a major factor in the decision to create it," would "reveal attorneys' interpretation of the law and analysis of the legal strategy that would be available to the government in the likely event that it would face such litigation").

Because documents prepared for purposes of litigation cannot be disclosed without compromising the process by which attorneys make decisions in the context of the adversarial trial process and would fundamentally disrupt the manner in which attorneys prepare to litigate cases through the court system, the documents identified by Mr. Bradbury, Mr. Baker, and Mr. Kovakas as falling within the terms of this protection are properly withheld under Exemption Five.

---

[14]  Such litigation, of course, in fact ensued.  <u>See</u> Kovakas Decl. ¶ 9.

*__The Presidential Communications Privilege.__*  In addition to the deliberative process privilege, three documents withheld by OLC are subject to the presidential communications privilege.  The Supreme Court has recognized a "presumptive privilege for Presidential communications" founded on the "President's generalized interest in confidentiality." U.S. v. Nixon, 418 U.S. at 708, and the Court of Appeals has specifically identified that privilege as one falling within the ambit of those covered by Exemption Five of FOIA.  See Judicial Watch, Inc. v. Dept. of Justice, 365 F.3d 1108, 1113 (D.C. Cir. 2004).  The presidential communications privilege protects "communications 'in performance of [a President's] responsibilities,' . . . 'of his office,' . . . and made 'in the process of shaping policies and making decisions.'" Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 449 (1977) (quoting U.S. v. Nixon, 418 U.S. at 708, 711).  In addition, the privilege protects communications involving close presidential advisers, including " both [] communications which these advisers solicited and received from others as well as those they authored themselves," in order to ensure that such advisers investigate issues and provide appropriate advice to the President.  In re Sealed Case, 121 F.3d at 752.  The privilege is "closely affiliated" with the deliberative process privilege, but, unlike that privilege, it "applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones."  In re Sealed Case, 121 F.3d at 745; see also id. at 744 ("Even though the presidential privilege is based on the need to preserve the President's access to candid advice, none of the cases suggests that it encompasses only the deliberative or advice portions of documents").

The Supreme Court found the presidential communications privilege "necessary to guarantee the candor of presidential advisers and to provide '[a] President and those who assist him . . . [with] free[dom] to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." In re Sealed Case, 121 F.3d at

-19-

743 (quoting U.S. v. Nixon, 418 U.S. at 708). The President "occupies a unique position in the constitutional scheme," Nixon v. Fitzgerald, 457 U.S. 731, 749 (1982), and thus, the Court of Appeals has recognized a "great public interest" in preserving "the confidentiality of conversations that take place in the President's performance of his official duties" because such confidentiality is necessary in order to protect "the effectiveness of the executive decision-making process." Nixon v. Sirica, 487 F.2d 700, 717 (D.C. Cir.1973); In re Sealed Case, 121 F.3d at 742.

Three of the documents withheld by OLC – Nos. 59, 68, and 130 – were withheld under this privilege. Bradbury Decl. ¶ 26 . Specifically, these documents are: emails among OLC and White House attorneys regarding the preparation of possible responses to questions posed to the President (No. 59); emails between White House and OLC attorneys regarding possible responses by the President to press inquiries on legal questions (No 68); and emails among White House and OLC attorneys and staff regarding the preparation of a presidential statement (No. 130). See id. Ex. E. In each of these cases, the documents are pre-decisional and deliberative documents because the final decision as to what the President would say is a decision made by the President, see id. ¶ 26, and the documents "contain advice from OLC attorneys to presidential advisers about the content of the [President's] statement and proposed answers." Id. As the decisions cited above establish, such communications are squarely protected by the presidential communications privilege. Accordingly, OLC's decision to withhold these documents under FOIA's Exemption Five must be upheld.

## CONCLUSION

Because each of the documents withheld by OLC, OIPR, and the Civil Division is entitled to the protection of one, or more, of the privileges encompassed within Exemption Five of FOIA, and because no other issue remains for decision following the negotiation of the parties, the Department is entitled to summary judgment in this case.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

JEFFREY A. TAYLOR
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

ELIZABETH J. SHAPIRO
Assistant Director, Federal Programs Branch


_____/s/ Rupa Bhattacharyya_____
RUPA BHATTACHARYYA (VA# 38877)
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C.  20044
Tel: (202) 514-3146
Fax: (202) 318-7593
Email: rupa.bhattacharyya@usdoj.gov

Dated:   January 26, 2007.