## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,           )
                                     )
                                     )
     Plaintiff,               )
                                     )
        v.                 )     Civil Action No. 06-00406 (HHK)
                                     )
U.S. DEPARTMENT OF JUSTICE    )
                                     )
                                     )
     Defendants.            )
_____)

I, Steven G. Bradbury, declare as follows:

1.  I am the Acting Assistant Attorney General for the Office of Legal Counsel ("OLC" or the "Office") of the United States Department of Justice (the "Department"). In my capacity as the Acting Assistant Attorney General for OLC, I supervise all operations of OLC, including its response to requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The information in this declaration is based on my personal knowledge, information, and belief, and on information provided to me in my official capacity as Acting Assistant Attorney General for OLC.

### JUDICIAL WATCH'S FOIA REQUEST AND OLC'S RESPONSES

2.  I am aware of the January 6, 2006, FOIA request made by Judicial Watch, Inc. ("Judicial Watch"), a copy of which is attached as Exhibit A (the "FOIA request"). Judicial Watch's FOIA request seeks documents regarding the authority of the National Security Agency to target for interception international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations (the "Terrorist Surveillance Program," "program" or "TSP").

3.  On July 13, 2006, OLC made its initial response to Judicial Watch in which we indicated that a search of the Office's unclassified files had been completed and that documents responsive to the request had been identified.  At that time, OLC released five documents, totaling 63 pages, and indicated that additional documents were being withheld pursuant to various privileges recognized under FOIA Exemption Five, 5 U.S.C. § 552(b)(5), including the deliberative process, attorney-client, attorney work-product, and presidential communications privileges.  (A copy of the July 13, 2006, letter is attached to this declaration as Exhibit B.)  The letter also informed Judicial Watch that OLC had referred documents to the Office of Information Policy ("OIP") for FOIA processing.

4.  On August 7, 2006, OLC notified Judicial Watch that the Department's Civil Division, which also received a copy of the FOIA request, had referred five unclassified documents to the Office for processing.  (A copy of the August 7, 2006, letter is attached to this declaration as Exhibit C.)  OLC explained that its prior response addressed three of the documents and that it was withholding the remaining two documents under FOIA Exemption Five.  In all, OLC withheld from Judicial Watch 292 unclassified records or categories of records totaling approximately 4,760 pages.

5.  With respect to classified material, OLC notified Judicial Watch on July 21, 2006, that the search of the Office's classified records had been completed, resulting in the identification of 158 records or categories of records responsive to the FOIA request.  (A copy of the July 21, 2006, letter is attached to this declaration as Exhibit D.)  OLC advised Judicial Watch that it had referred a certain number of these records or categories to other agencies or to other components of the Department for processing.  OLC also explained that the remaining records were being withheld under FOIA Exemption One, 5 U.S.C. § 552(b)(1), which protects

documents that are classified, FOIA Exemption Three, 5 U.S.C. § 552(b)(3), which protects

documents that are exempted from disclosure under FOIA by federal statute, and FOIA

Exemption Five, which protects privileged documents.[1]  I understand that Judicial Watch

subsequently advised counsel for the Department that it would not challenge OLC's withholding

of the classified documents, and I do not discuss those documents further in this declaration.

6.  A *Vaughn* index describing the 292 unclassified documents at issue in the litigation is

attached to this declaration as Exhibit E.  As the index indicates, all of the documents reflect

deliberations among OLC and other Executive Branch attorneys, undertaken after that highly

classified program was publicly disclosed in December 2005, regarding the legal authority for

the TSP.  For reasons discussed in more detail below, the deliberative process privilege protects

each document listed on the *Vaughn* index from disclosure.  In addition, most of the documents

are also shielded from disclosure by the attorney work product doctrine, and documents 59, 68,

and 130 are protected by the presidential communications privilege.  Finally, many of the

documents withheld by OLC contain personal information protected by FOIA Exemption Six, 5

U.S.C. § 552(b)(6).

## THE TERRORIST SURVEILLANCE PROGRAM

7.  On September 11, 2001, al Qaeda terrorists attacked the United States.  The attacks of

September 11th resulted in approximately 3,000 deaths—the highest single-day death toll from

hostile foreign attacks in the Nation's history.  In addition, these attacks shut down air travel in

the United States, disrupted the Nation's financial markets and government operations, and

caused billions of dollars in damage to the economy.

---

[1]  As a result of certain inadvertent errors, the responsive record counts were misstated in OLC's letter of July 21, 2006.  OLC ultimately identified 157 responsive records or categories of records, referred 66 of those records or categories of records to other components of the Department or other federal agencies, and, after appropriate consultations, withheld 91 records or categories of records under the exemptions provided by FOIA.

8.  Following those attacks, the President of the United States authorized the TSP, a highly classified signals intelligence program.  The President acknowledged the program's existence in a radio address on December 17, 2005, following an unauthorized disclosure of the program in the *New York Times*.  Since assuming the position of Acting Assistant Attorney General for OLC on February 4, 2005, my duties have required me to become familiar with the TSP.  It is a targeted and focused program intended to help "connect the dots" between known and potential terrorists and their affiliates.  In order to target a communication for interception under the TSP, there must be reasonable grounds to believe that one party to the communication is located outside the United States and that at least one party to the communication is a member or agent of al Qaeda or an affiliated terrorist organization.  The TSP, which operates in the context of the ongoing armed conflict with al Qaeda and its allies, is an early warning system with one purpose:  to detect and prevent another catastrophic attack on the United States in the wake of the attacks of September 11th.  As the President and various senior officials of the Intelligence Community have stated, the surveillance capability provided by the TSP is critical to the national security of the United States.[2]

## OLC'S RESPONSIBILITIES IN THE DEPARTMENT

9.  The principal function of OLC is to assist the Attorney General in his role as a legal adviser to the President of the United States and to departments and agencies in the Executive Branch.  In connection with this function, OLC often provides advice and prepares documents addressing a wide range of legal questions involving Executive Branch operations.  A significant

---

[2]  As the Attorney General announced on January 17, 2007 in a letter to Members of Congress, on January 10, 2007, a Judge of the Foreign Intelligence Surveillance Court ("FISC") issued orders authorizing the Government to target for collection international communications into or out of the United States where there is probable cause to believe that one of the communicants is a member or agent of al Qaeda or an associated terrorist organization.  As a result of these orders, which allow for the speed and agility necessary to intercept such communications effectively, any electronic surveillance that was occurring as part of the TSP is now being conducted subject to the approval of the FISC.  Under these circumstances, the President has determined not to reauthorize the TSP when the current authorization expires.

portion of OLC's work involves performing a purely advisory role as legal counsel to the Attorney General, providing confidential legal advice and analysis to the Attorney General and, through him or on his behalf, to the White House and other components of the Executive Branch.

10.    Although OLC generally does not represent the Government in litigation, the Office frequently provides legal advice to Department attorneys who are in the process of litigating—or anticipate litigating in the near future—sensitive or complex legal issues.  These cases often involve difficult legal questions related to, among other things, constitutional and national security law.  When working on such matters, OLC often provides substantive advice concerning preliminary briefs and other filings generated by the Department's litigating components, such as the Civil Division, the Criminal Division, or the Office of the Solicitor General.  In addition, OLC sometimes prepares memoranda and other documents with the understanding and expectation that the Department's litigators may incorporate OLC's legal analysis into their arguments.

11.    Members of this Office periodically provide legal advice to the President, the Attorney General, and other government officials with respect to the TSP.  In the days and weeks immediately following the public disclosure of the TSP by the *New York Times*, OLC attorneys—many of whom were previously unaware of the TSP's existence—created a number of documents analyzing, explaining, and defending the TSP's legality.  In particular, this Office attempted to identify and articulate the most relevant legal arguments respecting the TSP.

## DELIBERATIVE PROCESS PRIVILEGE

12.    The deliberative process privilege protects from disclosure all of the unclassified documents withheld by OLC.  This Office generated or received each of these documents in its advisory role; each document is non-final and pre-decisional; and each reflects internal

deliberations among OLC attorneys and other Executive Branch attorneys. Broadly speaking, the withheld documents consist of: (a) draft documents discussing the legal basis for the TSP; (b) handwritten attorney marginalia and notes; and (c) e-mails among various attorneys and officials in the Office, other components of the Department, and elsewhere in the Executive Branch generated while drafting documents and analyzing the TSP.

13. The draft documents consist of drafts of various documents discussing TSP and its legality, including drafts of the Department's January 19, 2006, paper entitled "Legal Authorities Supporting the Activities of the National Security Agency Described by the President" (the "White Paper"); a December 22, 2005, letter to Congress (the "Moschella letter") explaining the program's legality; talking points addressing various issues related to the program; responses to possible questions about the program's legality; proposed presidential remarks and a draft speech by the Attorney General explaining the program; and an editorial intended for publication in *USA Today*.

14. Creating draft documents is an integral part of deliberations within OLC, the Department, and the Executive Branch. Through the writing process, OLC attorneys focus, articulate, and refine their advice and analysis. Drafts do not represent the final position or ultimate views of the Office, the Department, or the Executive Branch. To the contrary, drafts are, by their very nature, pre-decisional and deliberative. They are part of the exchange of ideas and suggestions that accompanies all decisionmaking, and they reflect the preliminary assessments and suggestions of OLC attorneys.

15. Indeed, as a matter of Office policy, OLC attorneys exchange draft documents with one another for comments, edits, and suggestions. Inevitably, initial drafts of documents differ

substantially from the final versions, as attorneys adjust their analysis in response to input from their colleagues.

16.    The earlier drafts of the White Paper, for example, differ from the final copy ultimately released by the Department.  Comparing the final copy against the prior drafts would, inevitably, reveal changes and revisions made by OLC and the Department during the deliberative process.  Similarly, drafts of the talking points, the Moschella letter, the Attorney General's speech, editorial, and responses to potential TSP-related questions were prepared to assist senior Executive Branch officials in addressing and explaining various legal aspects of the TSP.  These drafts attempt to summarize succinctly particular issues and provide important background information in a concise, summary format for ease of understanding and presentation.  In preparing the drafts, the authors also attempted to anticipate and address questions that might arise about the TSP.

17.    Although the Department released the final version of the White Paper to the public and Congress, none of the draft documents withheld by OLC are, to my knowledge, public, and all were prepared with the expectation that they would be held in confidence.  Compelled disclosure of these non-public, pre-decisional, and deliberative draft documents would seriously inhibit and hinder the internal deliberations and frank discussions among OLC attorneys that are critical for providing candid and direct advice to the Executive Branch.

18.    Disclosure of the withheld e-mails would similarly undermine OLC's deliberative processes.  OLC and Department attorneys routinely send and receive e-mails that convey preliminary advice, analysis, and reactions to a legal issue in a substantive but informal manner.  Often, OLC attorneys use e-mail to engage their colleagues in "back and forth" discussions, just

as they might in a face-to-face meeting or when walking down the hall. OLC e-mails, in essence, reflect a fluid and evolving exchange of ideas.

19.    The e-mails withheld in this case are characteristic of OLC e-mail use. All the messages relate to the preparation of draft documents, and most contain commentaries on and discussions of the documents, including suggestions and opinions regarding the drafts' content; many also attach copies of drafts in progress. Forcing the production of these quintessentially deliberative and preliminary documents would impair decisionmaking by discouraging OLC attorneys from candidly and freely exchanging information and ideas with their colleagues while examining complicated legal issues.

20.    The confidentiality of the withheld attorney notes is also critical to OLC's deliberative processes. Like the e-mails, they contain attorneys' informal views and preliminary thoughts and reactions, and they are vital to the careful and thoughtful development of this Office's advice. Compelling their release would greatly harm OLC's deliberative processes by discouraging attorneys from placing their initial thoughts and reactions on paper.

21.    Similarly, attorneys' markings and marginalia on documents are important aspects of OLC's deliberative processes. Like many attorneys, OLC lawyers regularly mark, underline, highlight, bracket, and place comments on the documents they read. These markings reflect attorneys' individual mental impressions and evaluations, and the markings highlight important sections of documents for future reference. Disclosing these private markings would inevitably reveal the Department's internal deliberations.

22.    In sum, compelled disclosure of the unclassified documents withheld by OLC would cause serious harm to the deliberative processes of the Department of Justice and the Executive Branch and would disrupt the relationship between the Department and the President

and other officers of the Executive Branch.  It is essential to the mission of the Executive Branch

that OLC's legal advice, and the development of that advice, not be inhibited by concerns about

public disclosure.  Protecting the confidentiality of these documents is essential in order to

ensure that creative and even controversial legal arguments and theories may be explored

candidly, effectively, and in writing, as well as to ensure that Executive Branch officials will

continue to request OLC's legal views on sensitive matters.

### ATTORNEY WORK PRODUCT DOCTRINE

23.    In addition, as specified on the *Vaughn* index, most of the withheld documents—

including drafts of the White Paper, drafts of the Moschella letter, draft talking points, drafts of

the editorial, drafts of congressional testimony, draft responses to potential congressional

questions, and attorney e-mails, notes, and marginalia generated in the preparation of OLC's

legal analysis—are protected from disclosure by the attorney work product doctrine.

24.    All of the materials withheld under the attorney work product doctrine were

prepared after public disclosure of the TSP by the *New York Times*.  With that disclosure, OLC

and the Department immediately expected that Congress would hold investigative hearings into

the TSP's operations, and that third-parties likely would file lawsuits challenging the program.

Consequently, OLC attorneys drafted, reviewed, and deliberated on these documents not only

with the goal of articulating arguments in support of the TSP's legality, but also in contemplation

of anticipated litigation.

25.    Each of the documents withheld under the work product doctrine reflects attorneys'

thoughts, impressions, and legal analysis of arguments that OLC and others in the Department

believed might arise in the expected litigation.  In many cases, the Office transmitted either the

withheld documents or their substance to litigating components in the Department because

OLC's legal analysis might be used in developing the Government's litigating position and for the purpose of seeking advice from those components as to the litigation implications of our analysis. Consequently, releasing these non-final, pre-decisional, and deliberative documents would reveal legal arguments and analysis that the Department could present in lawsuits challenging the TSP.

## PRESIDENTIAL COMMUNICATIONS PRIVILEGE

26.    Documents 59, 68, and 130, in addition to falling under the deliberative process privilege, are protected by the presidential communications privilege, which protects communications that relate to decisions made by the President and that involve the President, his senior advisers, or staff working for senior presidential advisers. The three documents at issue are e-mails between OLC attorneys and advisers to the President concerning proposed answers to questions the President might receive concerning the TSP and a draft presidential statement discussing the TSP. The President was the ultimate decisionmaker as to the content of these documents. The withheld e-mails contain advice from OLC attorneys to presidential advisers about the content of the statement and proposed answers. Revealing these advisory documents would inevitably discourage a full and frank dialogue between presidential advisers and the Department of Justice.

## PERSONAL PRIVACY

27.    Finally, many of the documents withheld by OLC contain information that must be withheld to prevent an unwarranted invasion of privacy. The protected information includes the names of third-party individuals (non-government employees) and OLC and other government agency staff, as well as their personal information (such as addresses (including email addresses), home telephone numbers, or cellular phone numbers). There is no legitimate public

interest in the release of this information, as its disclosure would shed no light on the activities of the Department of Justice but could subject these individuals to unwanted public attention, harassment, or embarrassment.  Thus, information of this type that appears in the documents is protected from disclosure under FOIA Exemption Six, 5 U.S.C. § 552(b)(6).

I declare under penalty of perjury that the foregoing is true and correct.

Executed:  January 26, 2007

_____
STEVEN G. BRADBURY

# EXHIBIT A



**Judicial Watch™**

*Because no one
is above the law!*

IMMEDIATE RESPONSE
REQUESTED

## VIA FACSIMILE AND CERTIFIED U.S. MAIL

January 6, 2006

Melanie Ann Pustay
Deputy Director
Office of Information and Privacy
US DEPARTMENT OF JUSTICE
Flag Building, Suite 570
Washington, DC 20530-0001
(Fax No.: 202-514-1009)
(Art. No.: 7005 1160 0000 8544 7617)

Patricia D. Harris
Management Analyst, FOIA/PA
Justice Management Division
US DEPARTMENT OF JUSTICE
National Place Building, Room 1070
Washington, DC 20530-0001
(Fax. No.: 202-307-1874)
(Art. No.: 7005 1160 0000 8544 7624)

GayLa D. Sessoms, FOIA Coordinator
Office of Intelligence Policy and Review
US DEPARTMENT OF JUSTICE
Room 6150
950 Pennsylvania Avenue, N. W.
Washington, DC 20530-0001
(Fax. No.: 202-305-4211)
(Art. No.: 7005 1160 0000 8544 7631)

Thomas J. McIntyre, Chief
FOIA/PA Unit
Criminal Division
US DEPARTMENT OF JUSTICE
Keeney Building, Suite 1127
Washington DC, 20530-0001
(Fax. No.: 202-514-6117)
(Art. No.: 7005 1160 0000 8544 7648)

James M. Kovakas
Freedom of Info/PA Officer
Civil Division
US DEPARTMENT OF JUSTICE
Room 7304
20 Massachusetts Ave, NW
Washington, DC 20530-0001
(Fax. No.: 202-616-8202)
(Art. No.: 7005 1160 0000 8544 7655)

Elizabeth Farris
Supervisory Paralegal
Office of Legal Counsel
US DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, N. W.
Room 5515
Washington, DC 20530-0001
(Fax. No.: 202-514-0563)
(Art. No.: 7005 1160 0000 8544 7662)

Re: **Freedom of Information Act Request**

## EXPEDITED PROCESSING REQUESTED

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 2


Dear Sir/Madam:

Pursuant to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests that the U. S. Department of Justice (hereafter "DOJ"); the Office of the Attorney General (hereafter "AG"); the Office of the Deputy Attorney General (hereafter "DAG"); the Office of the Associate Attorney General (hereafter "ASG"); the Office of Intelligence Policy and Review (hereafter "OIPR"); the Criminal Division (hereafter "Criminal Division"); the Civil Division (hereafter "Civil Division"); the Justice Management Division (hereafter "JMD"); the Office of Legal Counsel (hereafter "OLC"); and the Office of Legal Policy (hereafter "OLP") produce any and all agency records concerning, relating to, or reflecting the following subjects within ten (10) working days:

> 1) Any and all legal opinion(s) and/or memorandum(a) regarding the authorization by President George W. Bush for the National Security Agency (hereafter "NSA") to monitor domestic communications without court-approved warrants, referenced in the attached *New York Times* story[1]

> 2) A presidential order signed in 2002 allowing and/or instructing the NSA to monitor domestic communications without court-approved warrants, referenced in the attached New York Times story.[2]

For purpose of this request, the term "record" shall mean: (1) any written, printed, or typed material of any kind, including without limitation all correspondence, memoranda, notes, messages, letters, cards, telegrams, teletypes, facsimiles, papers, forms, records, telephone messages, diaries, schedules, calendars, chronological data, minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns, computer printouts, printed matter, prospectuses, statements, checks, statistics, surveys, affidavits, contracts, agreements, transcripts, magazine or newspaper articles, or press releases; (2) any electronically, magnetically, or mechanically stored material of any kind, including without limitation all electronic mail or e-mail, meaning any electronically transmitted text or graphic communication created upon and transmitted or received by any computer or other electronic device, and all materials stored on compact disk, computer disk, diskette, hard drive, server, or tape; (3) any audio, aural, visual, or video records, recordings, or representations of any kind, including without limitation all cassette tapes,

---

[1] James Risen and Eric Lichtblau, "Bush Secretly lifted Some Limits on Spying in the US after 9/11, Officials Say," *The New York Times*, December 15, 2005

[2]        *Ibid*

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 3

compact disks, digital video disks, microfiche, microfilm, motion pictures, pictures, photographs, or videotapes; (4) any graphic materials and data compilations from which information can be obtained; (5) any materials using other means of preserving thought or expression; and (6) any tangible things from which data or information can be obtained, processed, recorded, or transcribed. The term "record" also shall mean any drafts, alterations, amendments, changes, or modifications of or to any of the foregoing.

**If you do not understand this request or any portion thereof, or if you feel you require clarification of this request or any portion thereof, please contact us immediately at 202-646-5172.**

If any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

**Judicial Watch, as a member of the news media, hereby requests expedited processing of this request, pursuant to 28 C. F. R. § 16.5(d)(ii)(iv).**

**Judicial Watch also hereby requests a waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii).**

Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media. Judicial Watch, Inc. regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and publishes and disseminates these works to the public. It intends to do likewise with the records it receives in response to this request.

As a member of the news media, Judicial Watch uses the following means, among others, to publish and disseminate its distinctive work to the public:

> (1)     Judicial Watch maintains an Internet site, www.JudicialWatch.org, where the public can review records obtained through FOIA and read editorial works prepared by Judicial Watch, Inc., including news releases, based on FOIA materials. This website is viewed by over 20,000 people per day on average, and on several occasions, has logged up to 1,000,000 visitors in a single day.

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 4

(2)     Judicial Watch also publishes a monthly newsletter in which it publishes its own
editorial works and presents, analyzes, and explains information it obtains through FOIA.
Judicial Watch, Inc.'s newsletter is sent to approximately 140,000 individuals each
month. The organization also utilizes an e-mail Infonet service that sends out updates of
Judicial Watch's activities over the Internet to almost 14,00 persons.

(3)     Judicial Watch also periodically publishes and disseminates its own distinct
works in the form of books and reports. For example, in September 1998 Judicial
Watch, Inc. published the *Interim Report on Crimes and Other Offenses Committed by
President Bill Clinton Warranting His Impeachment and Removal from Elected Office.*
This 145-page report was accompanied by nearly 4,000 pages of supporting
documentation and was crafted, in part, from the raw materials obtained by Judicial
Watch through FOIA requests, among other regular means. In August 1999, Judicial
Watch published *Filegate Status Report,* which is 136 pages long and is supported by
nearly 1000 pages of documentation. In March 2001, Judicial Watch, Inc. published *The
Judicial Watch Florida Recount,* an independent, non-partisan analysis of the results of
Florida's hotly contested 2000 Presidential election based upon an sampling of ballots
reviewed by Judicial Watch pursuant to Florida's version of FOIA. In February 2002,
Judicial Watch published *The Judicial Watch 2002 "State of the Union" Report, Bush
Administration Ethics Enforcement: "A Failure of Leadership."* In September 2002,
Judicial Watch, Inc. published *Fatal Neglect: The U.S. Government's Continuing
Failure to Protect American Citizens from Terrorists.* Most recently on November 21,
2003, Judicial Watch produced *Analysis of GAO Testimony: US Postal Service – Clear
Communication With Employees Needed Before Reopening of Brentwood Facility.*
(GAO-04-2057T/October 23, 2003). Comptroller General of the United States David M.
Walker, in a reply to Judicial Watch's *Analysis of GAO Testimony,* wrote on December
17, 2003, "We view Judicial Watch as an important accountability organization in
Washington, D.C." On February 16, 2005 Judicial Watch was rated by the highly
respected capitol newspaper *The Hill* as being one of the nation's top ten "watchdogs."
Most recently, on June 29, 2005, Judicial Watch produced a special report US Border
Patrol Survey Analysis, a report of an analysis of documents produced under FOIA.

Judicial Watch also publishes and disseminates its distinctive work by participating in
public conferences and seminars, including its own "Ethics in Government" conferences held in
Pasadena, California (1999), Washington, DC (2000), and Miami, FL (2001). Judicial Watch
also works with other media organizations to publish and disseminate distinctive work to the
public, and representatives of Judicial Watch appear frequently on nationally broadcast television
and radio programs. Judicial Watch has been granted press credentials at a number of national
conventions and other events.

Consequently, Judicial Watch qualifies for a waiver of search fees as a member of the
news media. *See National Security Archive v. U.S. Department of Defense,* 880 F.2d 1381, 1387

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 5

(D.C. Cir. 1989). In fact, Judicial Watch has been recognized as a member of the news media in other FOIA litigation. See *Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000).

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

> shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch ongoing efforts to monitor the operations and activities of the federal government and to educate the public about these operations and activities, and, in particular, as part of an investigation into the facts and circumstances surrounding the President's authorization of the NSA to conduct eavesdropping on the American public without consulting the proper courts under the Foreign Intelligence Surveillance Act (hereafter "FISA").

Courts applying the "public interest" fee waiver provision of FOIA typically take into account four factors in determining whether to grant a waiver: (1) whether the subject of the requested records concerns the operations or activities of government; (2) whether disclosure of the requested records is likely to contribute to an understanding of government operations or activities; (3) whether disclosure of the requested records will contribute to a "reasonably broad" audience and whether the requestor has the "ability and intention" to disseminate the information to the public; and (4) whether disclosure of the requested record will contribute "significantly" to the public understanding. See *D.C. Technical Assistance Org. v. HUD*, 85 F. Supp.2d 46, 48-49 (D.D.C. 2000); 28 C.F.R. § 16.11(k)(2)(i)-(iv). Request for "public interest" waivers are to be judged on a case-by-case basis." *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988).

Without question, the subject-matter of the request concerns the operations and activities of government, namely the legal decision made by the President to authorize such domestic spying and wiretapping, circumventing the FISA court.

Disclosure of the requested records is likely to contribute to an understanding of government operations and activities and will appeal to a "reasonably broad" audience because

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 6

the records relate directly to the facts and circumstances surrounding the legal decision to authorize or allow such domestic spying.

Indeed, the taxpaying American public deserves full disclosure of the facts and circumstances surrounding the Bush Administration's decision, which has cause nation-wide controversy, over his administration's decision to allow and or conduct such spying on American phone lines. Legal scholars have charged that the administration decision is the most striking example of executive overreach, claiming that the surveillance being conducted should rightly be approved by the FISA court giving normal due-process to American citizens and others whose communications may be monitored by the NSA and passed on to other law enforcement agencies. The decision which is the subject of this requested disclosure of records is currently a national news story which has dominated headlines for days. It is obviously a concern to more than a "reasonably broad" section of the American public, all of whom enjoy constitutional protection and presumption of innocence in their communications over the phone and elsewhere with regard to government searches. This disclosure will undoubtedly "significantly enhance" their understanding of this particular operation and activity of government, by demonstrating how these decisions regarding the wiretapping of phone calls was made.

Expedited Processing of this request is clearly warranted in light of the widespread public and media attention being given to this story, because of the questions of the governments integrity with regards to the constitutionality of these actions, and which effects public confidence.

Once Judicial Watch obtains the requested records, it intends to analyze them and disseminate the results of its analysis, as well as the records themselves, as a special written report. Judicial Watch will also educate the public via radio programs, Judicial Watch's website, and/or newsletter, among other outlets. It also will make the records available to other members of the media or researchers upon request. Judicial Watch has a proven ability to disseminate information obtained through FOIA to the public, as demonstrated by its long-standing and continuing public outreach efforts, including radio and television programs, website, newsletter, periodic published reports, public appearances, and other educational undertakings.

Finally, disclosure of the requested records will contribute significantly to the public's understanding because relatively little is known about the program in question. The records requested by Judicial Watch undoubtedly will shed additional light on this important matter.

**In accordance with 28 C. F. R. § 16.5 (d)(1)(3), Judicial Watch certifies to be true and correct to the best of its knowledge and belief that it has, as a member of the media, a compelling "urgency to inform the public about an actual or alleged federal government activity,"** *see* **28 C. F. R. § 16.5 (d)(1)(ii). Additionally this is "on a matter of widespread**

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 7


**and exceptional media interest in which there exists possible questions about the
government's integrity which affect public confidence" 28 C. F. R. § 16.5 (d)(1)(ii).**

Given these compelling circumstances, Judicial Watch is entitled to a public interest fee
waiver of both search costs and duplication costs. Nonetheless, in the event our request for a
waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to
$350.00 in search and/or duplication costs. Judicial Watch requests that it be contacted before
any such costs are incurred, in order to prioritize search and duplication efforts.

We look forward to receiving the requested documents and a waiver of both search and
duplication costs within ten (10) business days.

Sincerely,

JUDICIAL WATCH, INC.

Christopher J. Farrell

CJF/mac

December 15, 2005

# Bush Secretly Lifted Some Limits on Spying in U.S. After 9/11, Officials Say

**By JAMES RISEN
and ERIC LICHTBLAU**

Washington - Months after the Sept. 11 attacks, President Bush secretly authorized the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without the court-approved warrants ordinarily required for domestic spying, according to government officials.

Under a presidential order signed in 2002, the intelligence agency has monitored the international telephone calls and international e-mail messages of hundreds, perhaps thousands, of people inside the United States without warrants over the past three years in an effort to track possible "dirty numbers" linked to Al Qaeda, the officials said. The agency, they said, still seeks warrants to monitor entirely domestic communications.

The previously undisclosed decision to permit some eavesdropping inside the country without court approval represents a major shift in American intelligence-gathering practices, particularly for the National Security Agency, whose mission is to spy on communications abroad. As a result, some officials familiar with the continuing operation have questioned whether the surveillance has stretched, if not crossed, constitutional limits on legal searches.

"This is really a sea change," said a former senior official who specializes in national security law. "It's almost a mainstay of this country that the N.S.A. only does foreign searches."

Nearly a dozen current and former officials, who were granted anonymity because of the classified nature of the program, discussed it with reporters for The New York Times because of their concerns about the operation's legality and oversight.

According to those officials and others, reservations about aspects of the program have also been expressed by Senator John D. Rockefeller IV, the West Virginia Democrat who is the vice chairman of the Senate Intelligence Committee, and a judge presiding over a secret court that oversees intelligence matters. Some of the questions about the agency's new powers led the administration to temporarily suspend the operation last year and impose more restrictions, the officials said.

The Bush administration views the operation as necessary so that the agency can move quickly to monitor communications that may disclose threats to this country, the officials said. Defenders

of the program say it has been a critical tool in helping disrupt terrorist plots and prevent attacks inside the United States.

Administration officials are confident that existing safeguards are sufficient to protect the privacy and civil liberties of Americans, the officials say. In some cases, they said, the Justice Department eventually seeks warrants if it wants to expand the eavesdropping to include communications confined within the United States. The officials said the administration had briefed Congressional leaders about the program and notified the judge in charge of the Foreign Intelligence Surveillance Court, the secret Washington court that deals with national security issues.

The White House asked The New York Times not to publish this article, arguing that it could jeopardize continuing investigations and alert would-be terrorists that they might be under scrutiny. After meeting with senior administration officials to hear their concerns, the newspaper delayed publication for a year to conduct additional reporting. Some information that administration officials argued could be useful to terrorists has been omitted.

While many details about the program remain secret, officials familiar with it said the N.S.A. eavesdropped without warrants on up to 500 people in the United States at any given time. The list changes as some names are added and others dropped, so the number monitored in this country may have reached into the thousands over the past three years, several officials said. Overseas, about 5,000 to 7,000 people suspected of terrorist ties are monitored at one time, according to those officials.

Several officials said the eavesdropping program had helped uncover a plot by Iyman Faris, an Ohio trucker and naturalized citizen who pleaded guilty in 2003 to supporting Al Qaeda by planning to bring down the Brooklyn Bridge with blowtorches. What appeared to be another Qaeda plot, involving fertilizer bomb attacks on British pubs and train stations, was exposed last year in part through the program, the officials said. But they said most people targeted for N.S.A. monitoring have never been charged with a crime, including an Iranian-American doctor in the South who came under suspicion because of what one official described as dubious ties to Osama bin Laden.

Dealing with a New Threat

The eavesdropping program grew out of concerns after the Sept. 11 attacks that the nation's intelligence agencies were not poised to deal effectively with the new threat of Al Qaeda and that they were handcuffed by legal and bureaucratic restrictions better suited to peacetime than war, according to officials. In response, President Bush significantly eased limits on American intelligence and law enforcement agencies and the military.

But some of the administration's antiterrorism initiatives have provoked an outcry from members of Congress, watchdog groups, immigrants and others who argue that the measures erode protections for civil liberties and intrude on Americans' privacy. Opponents have challenged provisions of the USA Patriot Act, the focus of contentious debate on Capitol Hill this week, that expand domestic surveillance by giving the Federal Bureau of Investigation more power to collect information like library lending lists or Internet use. Military and F.B.I. officials have drawn criticism for monitoring what were largely peaceful antiwar protests. The Pentagon and

the Department of Homeland Security were forced to retreat on plans to use public and private databases to hunt for possible terrorists. And last year, the Supreme Court rejected the administration's claim that those labeled "enemy combatants" were not entitled to judicial review of their open-ended detention.

Mr. Bush's executive order allowing some warrantless eavesdropping on those inside the United States including American citizens, permanent legal residents, tourists and other foreigners is based on classified legal opinions that assert that the president has broad powers to order such searches, derived in part from the September 2001 Congressional resolution authorizing him to wage war on Al Qaeda and other terrorist groups, according to the officials familiar with the N.S.A. operation.

The National Security Agency, which is based at Fort Meade, Md., is the nation's largest and most secretive intelligence agency, so intent on remaining out of public view that it has long been nicknamed "No Such Agency." It breaks codes and maintains listening posts around the world to eavesdrop on foreign governments, diplomats and trade negotiators as well as drug lords and terrorists. But the agency ordinarily operates under tight restrictions on any spying on Americans, even if they are overseas, or disseminating information about them.

What the agency calls a "special collection program" began soon after the Sept. 11 attacks, as it looked for new tools to attack terrorism. The program accelerated in early 2002 after the Central Intelligence Agency started capturing top Qaeda operatives overseas, including Abu Zubaydah, who was arrested in Pakistan in March 2002. The C.I.A. seized the terrorists' computers, cellphones and personal phone directories, said the officials familiar with the program. The N.S.A. surveillance was intended to exploit those numbers and addresses as quickly as possible, the officials said.

In addition to eavesdropping on those numbers and reading e-mail messages to and from the Qaeda figures, the N.S.A. began monitoring others linked to them, creating an expanding chain. While most of the numbers and addresses were overseas, hundreds were in the United States, the officials said.

Under the agency's longstanding rules, the N.S.A. can target for interception phone calls or e-mail messages on foreign soil, even if the recipients of those communications are in the United States. Usually, though, the government can only target phones and e-mail messages in this country by first obtaining a court order from the Foreign Intelligence Surveillance Court, which holds its closed sessions at the Justice Department.

Traditionally, the F.B.I., not the N.S.A., seeks such warrants and conducts most domestic eavesdropping. Until the new program began, the N.S.A. typically limited its domestic surveillance to foreign embassies and missions in Washington, New York and other cities, and obtained court orders to do so.

Since 2002, the agency has been conducting some warrantless eavesdropping on people in the United States who are linked, even if indirectly, to suspected terrorists through the chain of phone numbers and e-mail addresses, according to several officials who know of the operation. Under the special program, the agency monitors their international communications, the officials

said. The agency, for example, can target phone calls from someone in New York to someone in Afghanistan.

Warrants are still required for eavesdropping on entirely domestic-to-domestic communications, those officials say, meaning that calls from that New Yorker to someone in California could not be monitored without first going to the Federal Intelligence Surveillance Court.

A White House Briefing

After the special program started, Congressional leaders from both political parties were brought to Vice President Dick Cheney's office in the White House. The leaders, who included the chairmen and ranking members of the Senate and House intelligence committees, learned of the N.S.A. operation from Mr. Cheney, Gen. Michael V. Hayden of the Air Force, who was then the agency's director and is now the principal deputy director of national intelligence, and George J. Tenet, then the director of the C.I.A., officials said.

It is not clear how much the members of Congress were told about the presidential order and the eavesdropping program. Some of them declined to comment about the matter, while others did not return phone calls.

Later briefings were held for members of Congress as they assumed leadership roles on the intelligence committees, officials familiar with the program said. After a 2003 briefing, Senator Rockefeller, the West Virginia Democrat who became vice chairman of the Senate Intelligence Committee that year, wrote a letter to Mr. Cheney expressing concerns about the program, officials knowledgeable about the letter said. It could not be determined if he received a reply. Mr. Rockefeller declined to comment. Aside from the Congressional leaders, only a small group of people, including several cabinet members and officials at the N.S.A., the C.I.A. and the Justice Department, know of the program.

Some officials familiar with it say they consider warrantless eavesdropping inside the United States to be unlawful and possibly unconstitutional, amounting to an improper search. One government official involved in the operation said he privately complained to a Congressional official about his doubts about the legality of the program. But nothing came of his inquiry. "People just looked the other way because they didn't want to know what was going on," he said.

A senior government official recalled that he was taken aback when he first learned of the operation. "My first reaction was, 'We're doing what?'" he said. While he said he eventually felt that adequate safeguards were put in place, he added that questions about the program's legitimacy were understandable.

Some of those who object to the operation argue that is unnecessary. By getting warrants through the foreign intelligence court, the N.S.A. and F.B.I. could eavesdrop on people inside the United States who might be tied to terrorist groups without skirting longstanding rules, they say.

court has turned down only a small number of requests over the years. In 2004, according to the Justice Department, 1,754 warrants were approved. And the Foreign Intelligence Surveillance Court can grant emergency approval for wiretaps within hours, officials say.

Administration officials counter that they sometimes need to move more urgently, the officials said. Those involved in the program also said that the N.S.A.'s eavesdroppers might need to start monitoring large batches of numbers all at once, and that it would be impractical to seek permission from the Foreign Intelligence Surveillance Court first, according to the officials.

Culture of Caution and Rules

The N.S.A. domestic spying operation has stirred such controversy among some national security officials in part because of the agency's cautious culture and longstanding rules.

Widespread abuses including eavesdropping on Vietnam War protesters and civil rights activists by American intelligence agencies became public in the 1970's and led to passage of the Foreign Intelligence Surveillance Act, which imposed strict limits on intelligence gathering on American soil. Among other things, the law required search warrants, approved by the secret F.I.S.A. court, for wiretaps in national security cases. The agency, deeply scarred by the scandals, adopted additional rules that all but ended domestic spying on its part.

After the Sept. 11 attacks, though, the United States intelligence community was criticized for being too risk-averse. The National Security Agency was even cited by the independent 9/11 Commission for adhering to self-imposed rules that were stricter than those set by federal law.

Several senior government officials say that when the special operation first began, there were few controls on it and little formal oversight outside the N.S.A. The agency can choose its eavesdropping targets and does not have to seek approval from Justice Department or other Bush administration officials. Some agency officials wanted nothing to do with the program, apparently fearful of participating in an illegal operation, a former senior Bush administration official said. Before the 2004 election, the official said, some N.S.A. personnel worried that the program might come under scrutiny by Congressional or criminal investigators if Senator John Kerry, the Democratic nominee, was elected president.

In mid-2004, concerns about the program expressed by national security officials, government lawyers and a judge prompted the Bush administration to suspend elements of the program and revamp it.

For the first time, the Justice Department audited the N.S.A. program, several officials said. And to provide more guidance, the Justice Department and the agency expanded and refined a checklist to follow in deciding whether probable cause existed to start monitoring someone's communications, several officials said.

A complaint from Judge Colleen Kollar-Kotelly, the federal judge who oversees the Federal Intelligence Surveillance Court, helped spur the suspension, officials said. The judge questioned whether information obtained under the N.S.A. program was being improperly used as the basis for F.I.S.A. wiretap warrant requests from the Justice Department, according to senior government officials. While not knowing all the details of the exchange, several government lawyers said there appeared to be concerns that the Justice Department, by trying to shield the existence of the N.S.A. program, was in danger of misleading the court about the origins of the information cited to justify the warrants.

One official familiar with the episode said the judge insisted to Justice Department lawyers at one point that any material gathered under the special N.S.A. program not be used in seeking wiretap warrants from her court. Judge Kollar-Kotelly did not return calls for comment.

A related issue arose in a case in which the F.B.I. was monitoring the communications of a terrorist suspect under a F.I.S.A.-approved warrant, even though the National Security Agency was already conducting warrantless eavesdropping. According to officials, F.B.I. surveillance of Mr. Faris, the Brooklyn Bridge plotter, was dropped for a short time because of technical problems. At the time, senior Justice Department officials worried what would happen if the N.S.A. picked up information that needed to be presented in court. The government would then either have to disclose the N.S.A. program or mislead a criminal court about how it had gotten the information.

The Civil Liberties Question

Several national security officials say the powers granted the N.S.A. by President Bush go far beyond the expanded counterterrorism powers granted by Congress under the USA Patriot Act, which is up for renewal. The House on Wednesday approved a plan to reauthorize crucial parts of the law. But final passage has been delayed under the threat of a Senate filibuster because of concerns from both parties over possible intrusions on Americans' civil liberties and privacy.

Under the act, law enforcement and intelligence officials are still required to seek a F.I.S.A. warrant every time they want to eavesdrop within the United States. A recent agreement reached by Republican leaders and the Bush administration would modify the standard for F.B.I. wiretap warrants, requiring, for instance, a description of a specific target. Critics say the bar would remain too low to prevent abuses.

Bush administration officials argue that the civil liberties concerns are unfounded, and they say pointedly that the Patriot Act has not freed the N.S.A. to target Americans. "Nothing could be further from the truth," wrote John Yoo, a former official in the Justice Department's Office of Legal Counsel, and his co-author in a Wall Street Journal opinion article in December 2003. Mr. Yoo worked on a classified legal opinion on the N.S.A.'s domestic eavesdropping program.

At an April hearing on the Patriot Act renewal, Senator Barbara A. Mikulski, Democrat of Maryland, asked Attorney General Alberto R. Gonzales and Robert S. Mueller III, the director of the F.B.I., "Can the National Security Agency, the great electronic snooper, spy on the American people?"

"Generally," Mr. Mueller said, "I would say generally, they are not allowed to spy or to gather information on American citizens." President Bush did not ask Congress to include provisions for the N.S.A. domestic surveillance program as part of the Patriot Act and has not sought any other laws to authorize the operation. Bush administration lawyers argued that such new laws were unnecessary, because they believed that the Congressional resolution on the campaign against terrorism provided ample authorization, officials said.

Seeking Congressional approval was also viewed as politically risky because the proposal would be certain to face intense opposition on civil liberties grounds. The administration also feared

that by publicly disclosing the existence of the operation, its usefulness in tracking terrorists would end, officials said.

The legal opinions that support the N.S.A. operation remain classified, but they appear to have followed private discussions among senior administration lawyers and other officials about the need to pursue aggressive strategies that once may have been seen as crossing a legal line, according to senior officials who participated in the discussions.

For example, just days after the Sept. 11, 2001, attacks on New York and the Pentagon, Mr. Yoo, the Justice Department lawyer, wrote an internal memorandum that argued that the government might use "electronic surveillance techniques and equipment that are more powerful and sophisticated than those available to law enforcement agencies in order to intercept telephonic communications and observe the movement of persons but without obtaining warrants for such uses."

Mr. Yoo noted that while such actions could raise constitutional issues, in the face of devastating terrorist attacks "the government may be justified in taking measures which in less troubled conditions could be seen as infringements of individual liberties."

The next year, Justice Department lawyers disclosed their thinking on the issue of warrantless wiretaps in national security cases in a little-noticed brief in an unrelated court case. In that 2002 brief, the government said that "the Constitution vests in the President inherent authority to conduct warrantless intelligence surveillance (electronic or otherwise) of foreign powers or their agents, and Congress cannot by statute extinguish that constitutional authority."

Administration officials were also encouraged by a November 2002 appeals court decision in an unrelated matter. The decision by the Foreign Intelligence Surveillance Court of Review, which sided with the administration in dismantling a bureaucratic "wall" limiting cooperation between prosecutors and intelligence officers, noted "the president's inherent constitutional authority to conduct warrantless foreign intelligence surveillance."

But the same court suggested that national security interests should not be grounds "to jettison the Fourth Amendment requirements" protecting the rights of Americans against undue searches. The dividing line, the court acknowledged, "is a very difficult one to administer."

# EXHIBIT B

/13/2006 15:59 FAX 2025140563        DOJ OLC        ☒002



**U.S. Department of Justice**

Office of Legal Counsel

_Washington, D.C. 20530_

July 13, 2006

Christopher J. Farrell
Judicial Watch, Inc.
501 School Street, S.W.
Suite 500
Washington, DC  20024

Dear Mr. Farrell:

This is in partial response to your Freedom of Information Act request dated January 2, 2006.  We have completed our search of the unclassified files of the Office of Legal Counsel and have found a large number of documents that are responsive to your request.  We have not completed our search of our classified files.  Five documents are enclosed.  We are withholding the remaining documents pursuant to Exemption Five of the Act, 5 U.S.C. § 552 (b)(5).  The withheld documents are protected by the deliberative process, attorney-client and attorney workproduct privileges, and a small number of the documents are also protected by the presidential communications privilege.  The documents are not appropriate for discretionary release.  We have referred documents to the Office of Information and Privacy, which will be responding directly to you.

Although I am aware that your request is the subject of litigation, I am required by statute and regulation to inform you that you have the right to file an administrative appeal.

Sincerely,

Paul P. Colborn
Special Counsel
Office of Legal Counsel

Enclosures

# EXHIBIT C



**U.S. Department of Justice**

Office of Legal Counsel

---

*Washington, D.C. 20530*

August 7, 2006

Christopher J. Farrell
Judicial Watch
501 School Street, S.W.
Suite 500
Washington, DC   20024

Dear Mr. Farrell:

This is in further response to your Freedom of Information Act request dated January 6, 2006.  Two documents which originated in this Office but were located in the files of the Civil Division are being withheld pursuant to Exemption Five of the Act, 5 U.S.C. § 552(b)(5).  The documents are protected by the deliberative process privilege and are not appropriate for discretionary release.  In addition the Civil Division referred three documents that were previously processed in response to your FOIA request of the same date directed to this Office.

Although I am aware that your request is the subject of litigation, I am required by statute and regulation to inform you that you have the right to file an administrative appeal.

Sincerely,

*Paul P. Colborn*

Paul P. Colborn
Special Counsel
Office of Legal Counsel

# EXHIBIT D



**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the Deputy Assistant Attorney General                     Washington, D.C. 20530

July 21, 2006

Mr. Mario A. Calabrese
Mr. Christopher Farrell
Judicial Watch, Inc.
501 School Street, SW
Suite 500
Washington, DC 20024

Dear Messrs. Calabrese and Farrell:

This is in further response to your Freedom of Information Act ("FOIA") request dated January 2, 2006. We have completed our search of the classified files of the Office of Legal Counsel ("OLC") and found 39 agency records or categories of agency records responsive to your request, including 12 records or categories of records referred by the Office of the Deputy Attorney General. Four of these records or categories of records have been referred to other agencies or to other components of the Department of Justice for processing and/or consultations. As to two of these referrals, we have been asked to advise you that the agency to which they were referred has determined that they are properly withheld in full because they are classified and thus exempt under Exemption 1 of the FOIA, 5 U.S.C. § 552(b)(1), and/or because they contain information of the type described in Section 6 of the National Security Act of 1959, Pub. L. No. 86-36, 5 6, 73 Stat. 63,64, codified at 50 U.S.C. § 402 note, and/or in Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-l(i)(l), and are thus exempt under Exemption 3 of the FOIA, 5 U.S.C. § 552(b)(3). Additionally, we have been asked to advise you that one of these two referrals is subject to the deliberative process and attorney-client privileges, and the attorney work product doctrine, and thus is also withheld under Exemption 5, 5 U.S.C. § 552(b)(5). Our consultations with respect to the two remaining referred records or categories of records are ongoing and you will be advised when determinations are made.

Of the 35 remaining records or categories of records, we have identified two additional copies of the January 19, 2006, Department of Justice White Paper, entitled "Legal Authorities Supporting the Activities of the National Security Agency Described by the President," which we understand is being released to you today by the Office of Information and Privacy. We have also identified one document, a memorandum dated September 2001 from this Office to the Office of White House Counsel, which is being withheld in full under Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5). This document is subject to the deliberative process privilege, the attorney client communication privilege, and the presidential communication privilege, and also contains handwritten marginalia and notes by an OLC attorney, which are independently subject to the deliberative process and attorney-client privileges.

-2-

The remaining responsive agency records or categories of records are classified and are therefore being withheld in full pursuant to Exemption 1 of the FOIA, 5 U.S.C. § 552(b)(l). Additionally, many of these documents contain information of the type described in Section 6 of the National Security Act of 1959, Pub. L. No. 86-36, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note, and/or in Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-l(i)(l), and/or are protected by the deliberative process privilege, the attorney-client privilege, the presidential communications privilege, or the attorney work product doctrine. Thus, the documents subject to these protections are also being withheld pursuant to Exemptions 3 and 5 of the FOIA, 5 U.S.C. §§ 552(b)(3), (5).

Please be advised that we have also identified documents responsive to your request that are not agency records as defined in the Act. These documents are not provided.

Although I am aware that your request is the subject of litigation, I am required by statute and regulation to inform you that you have the right to file an administrative appeal.

Sincerely,

John A. Eisenberg
Deputy Assistant Attorney General

# EXHIBIT E

Judicial Watch, Inc.,  v. U.S. Department of Justice

Civil Action No. 06-00406 (HHK)
United States District Court
for the District of Columbia

<u>Vaughn Index</u>

January 26, 2007

Description of the unclassified records of the Office of Legal Counsel protected by FOIA Exemption 5.

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 1 | 12/20/05 | Fax from the Office of the Counsel to the President to OLC transmitting handwritten edits to draft talking points | DP & WP | 5 |
| 2 | 12/19/05 | Fax from the Office of the Counsel to the President to OLC transmitting handwritten edits to draft talking points | DP & WP | 10 |
| 3 | undated | Pages from a March 1976 hearing on the Foreign Intelligence Surveillance Act, with marginalia and underscoring by OLC attorney | DP & WP | 16 |
| 4 | 1/5/06 | Two copies of a January 5, 2006 Congressional Research Service memorandum, with marginalia and notes by OLC attorney | DP & WP | 88 |
| 5 | undated | Pages from a June 1976 hearing on the Foreign Intelligence Surveillance Act, with marginalia and underscoring by OLC attorney | DP & WP | 12 |
| 6 | 12/19/05 | Memorandum for the Office of the Counsel to the President from Office of the Vice President transmitting comments on draft talking points (document attached) | DP & WP | 2 |
| 7 | 12/19/05 | Press Briefing by AG and Principal Deputy Director for National Intelligence, with underscoring and highlighting by OLC attorney | DP & WP | 13 |
| 8 | Undated | OLC attorney's handwritten notes pertinent to preparation of legal analysis | DP & WP | 15 |
| 9 | 12/19/05 | Emails among OLC attorneys relaying request for guidance from ODAG | DP | 1 |
| 10 | 1/3/06 | Memorandum for the House Permanent Select Committee on Intelligence from Jeffrey Smith, with marginalia and underscoring by OLC attorney | DP &WP | 14 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 11 | 1/20/06 | Written Testimony of Prof. Jonathan Turley before House Judiciary Committee, with marginalia by OLC attorney | DP & WP | 13 |
| 12 | 12/20/05 | Fax from the Office of the Counsel to the President to OLC transmitting comments on draft Moschella letter | DP & WP | 4 |
| 13 | 1/6/06 | Letter from Professor Lawrence Tribe to Honorable John Conyers, U.S. House of Representatives, with marginalia and underscoring by OLC attorney | DP & WP | 6 |
| 14 | 12/18/05 | Emails between OLC attorneys regarding schedule to complete draft talking points | DP | 1 |
| 15 | 12/17/05 | Emails between OLC attorneys regarding logistics for meeting to discuss TSP issues | DP | |
| 16 | Undated | Document by DOJ attorney containing personal views of issues pertaining to the NSA activities, with marginalia and underscoring by OLC attorney | DP & WP | 9 |
| 17 | Undated | Draft legislation | DP | 3 |
| 18 | 12/22/05 | Final copy of Moschella letter, with marginalia by OLC attorney | DP & WP | 5 |
| 19 | 1/9/06 | Letter from law professors to members of Congress, with marginalia by OLC attorney | DP & WP | 11 |
| 20 | Undated | Draft proposed legislation, with marginalia and underscoring by OLC attorney | DP & WP | 4 |
| 21 | Undated | Draft talking points | DP & WP | 3 |
| 22 | Undated | Two copies of comments on discussion draft of White Paper | DP & WP | 4 |
| 23 | Undated | Draft responses to congressional questions | DP & WP | 11 |
| 24 | 1/20/06 | Email among OLC attorneys forwarding link to CRS report | DP | 1 |
| 25 | 12/30/05 | Draft bullet points and talking points outlining procedures for responding to TSP-related inquiries | DP | 2 |
| 26 | 3 dated 12/21/05 the rest undated | Fifteen separate drafts, with attorney notes, of Moschella letter | DP & WP | 59 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 27 | Undated | Final version of talking points regarding CRS analysis | DP & WP | 3 |
| 28 | Undated | OLC attorney notes suggesting responses to legal analysis by Jeff Smith and Prof. Tribe | DP & WP | 1 |
| 29 | Undated | Two copies of draft legal analysis pertinent to preparation of talking points | DP & WP | 2 |
| 30 | Undated | Draft legal analysis pertinent to preparation of White Paper, with marginalia and underscoring by OLC attorney | DP & WP | 2 |
| 31 | Most are undated; a few dated between 12/20/05 and 12/22/05 | Fifteen drafts of talking points regarding legal authorities for the NSA activities, with marginalia by OLC attorneys | DP & WP | 42 |
| 32 | Undated | Draft of possible congressional questions created in preparation for Attorney General testimony, with handwritten note to Attorney General | DP & WP | 1 |
| 33 | Undated | Two draft responses to possible congressional questions created in preparation for Attorney General testimony | DP & WP | 2 |
| 34 | 12/25/05 | Comments on draft White Paper, with marginalia and underscoring by OLC attorney | DP & WP | 5 |
| 35 | Undated | Draft entitled "Possible Statement on Definition of Electronic Surveillance" with marginalia by OLC attorney | DP & WP | 2 |
| 36 | 1/6/06 | Legal analysis entitled "Miscellaneous Points" pertinent to preparation of White Paper | DP & WP | 2 |
| 37 | Undated | Draft talking points | DP & WP | 3 |
| 38 | Undated | Two copies of legal analysis pertinent to preparation of White Paper | DP & WP | 4 |
| 39 | Undated | Two copies of legal analysis pertinent to preparation of White Paper | DP & WP | 2 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 40 | One undated, one dated 1/19/06 | Two copies of draft Attorney General speech, with marginalia and notes by OLC attorney | DP | 17 |
| 41 | dated between 12/22/05 and 1/18/06 | About 35 copies (plus miscellaneous pages) of draft White Paper, with marginalia by OLC attorneys | DP & WP | 1100 (est.) |
| 42 | 1/14/05 | Emails between OLC and OAG attorneys regarding preparation of White Paper | DP & WP | 2 |
| 43 | 12/30/05 | Email between OLC attorneys transmitting comments on draft White Paper (comments attached[1]) | DP & WP | 7 |
| 44 | 1/11/06 - 1/12/06 | Emails between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 10 |
| 45 | 1/13/06 | Emails among OLC, Civil, ODAG, OAG, OSG, OIPR, OLA, and CRIM attorneys regarding preparation of White Paper (comments attached) | DP & WP | 3 |
| 46 | 12/22/05 | Emails among OLC attorneys regarding preparation of legal analysis | DP & WP | 2 |
| 47 | 12/20/05 | Emails among OLC, OAG and White House attorneys regarding preparation of Moschella letter (draft attached) | DP & WP | 2 |
| 48 | 12/20/05 | Emails among OLC, OPA, OLA, OAG, and OLP attorneys regarding draft talking points (draft attached) | DP & WP | 3 |
| 49 | 12/20/05 | Emails between OLC and White House attorneys regarding draft talking points (draft attached) | DP &WP | 7 |
| 50 | 12/28/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 51 | 12/28/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 4 |

---

[1] An email and its attachment(s) are classified as one privileged document on this index. Page counts for emails, however, refer only to the total length of email text.

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 52 | 12/17/05-12/18/06 | Emails among OLC, State, OIPR and White House attorneys regarding preparation of question responses | DP & WP | 5 |
| 53 | 1/6/06 | Emails among OLC attorneys regarding preparation of response to CRS report (draft response attached) | DP & WP | 6 |
| 54 | 1/10/06 | Emails between OLC, OAG, Civil, ODAG, OIPR, OLA, CRIM and White House attorneys regarding preparation of White Paper (draft attached) | DP & WP | 2 |
| 55 | 12/21/05 | Emails among OLC attorneys regarding preparation of White Paper and/or Moschella letter | DP & WP | 2 |
| 56 | 1/19/06-1/20/06 | Emails among OLC and White House attorneys regarding preparation of talking points (draft attached) | DP & WP | 3 |
| 57 | 1/4/06-1/10/06 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 24 |
| 58 | 12/21/05 | Emails among OLC and White House attorneys regarding draft Moschella letter (draft attached) | DP & WP | 4 |
| 59 | 12/19/05 | Emails among OLC and White House attorneys regarding preparation of possible responses to questions to the President (draft attached) | DP & PC | 6 |
| 60 | 1/19/06 | Emails among OLC attorneys regarding preparation of White Paper (drafts attached) | DP & WP | 1 |
| 61 | 1/3/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 3 |
| 62 | 12/16/05 | Emails among OLC, OPA, OAG, OLA and OLP staff regarding response to press inquiry from AP | DP | 5 |
| 63 | 1/20/06 | Emails among OLC and OPA staff regarding response to press inquiry from Fox News | DP | 5 |
| 64 | 12/29/06 | Emails between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 65 | 1/11/06 | Emails among OLC and OLA attorneys regarding potential responses to legal arguments made by Prof. Tribe (draft attached) | DP & WP | 6 |
| 66 | 1/19/06 | Emails among OLC attorneys regarding preparation of Attorney General speech | DP | 2 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 67 | 1/17/06 | Emails among OLC, OPA and White House staff regarding how to respond to press inquiry from Reuters | DP | 4 |
| 68 | 12/17/05 | Emails between White House and OLC attorneys regarding possible responses by the President to press inquiries on legal questions | DP & PC | 2 |
| 69 | 1/15/06 | Emails among OLC, OLA, OAG, ODAG, Office of the Associate Attorney General, Office of the Vice President and White House attorneys regarding preparation of McCallum *USA Today* letter | DP & WP | 6 |
| 70 | 12/19/05-12/20/05 | Emails among OLC, State, NSC, and White House attorneys regarding preparation of State Department cable to embassies providing talking points regarding the NSA activities | DP | 20 |
| 71 | 1/9/06 | Emails among OLC attorneys discussing how to respond to arguments raised in a letter by constitutional scholars | DP & WP | 4 |
| 72 | 1/9/06 | Emails among OLC attorneys regarding preparation of White Paper and comments by OIPR | DP & WP | 2 |
| 73 | 1/4/06 | Emails among White House and OLC staff regarding preparation of talking points on the NSA activities (draft attached) | DP & WP | 6 |
| 74 | 1/6/06 | Emails among OLC and OAG attorneys regarding preparation of talking points in response to CRS report (copy attached) | DP & WP | 1 |
| 75 | 12/21/05 | Emails between OLC attorneys regarding preparation of White Paper and discussing Chicago Tribune editorial, with marginalia by OLC attorney | DP & WP | 12 |
| 76 | 12/23/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 3 |
| 77 | 12/20/05-12/21/05 | Emails among OLC, OAG, and OLA attorneys regarding communications with David Kris (draft Kris document attached) (Kris documents released in redacted form by OIP) | DP | 4 |
| 78 | 1/6/06 | Emails among OLC, OPA, OAG and OLA staff regarding response to Congressional Research Service report | DP & WP | 21 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 79 | 1/19/06 | Email between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 80 | 1/18/06 - 1/19/06 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 11 |
| 81 | 12/29/05 - 12/31/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 3 |
| 82 | 12/20/05 | Emails among OLC and CRIM attorneys regarding preparation of Moschella letter | DP & WP | 1 |
| 83 | 12/21/05 | Emails between OLC and White House attorneys regarding preparation of Moschella letter (draft attached) | DP & WP | 1 |
| 84 | 12/21/05 | Emails between OLC attorneys regarding preparation of Moschella letter | DP & WP | 1 |
| 85 | 1/3/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 86 | 12/29/05 - 1/3/06 | Emails among OLC attorneys regarding preparation of White Paper, attaching internal OLC memorandum containing potentially relevant legal analysis | DP & WP | 8 |
| 87 | 1/16/06 | Emails among White House and OLC attorneys regarding preparation of White Paper | DP & WP | 4 |
| 88 | 1/19/06 | Email among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 89 | 12/20/05 | Emails among OLC, OAG, NSC, and White House attorneys regarding preparation of talking points | DP & WP | 3 |
| 90 | 1/19/06 | Emails among OLC, OLP and OPA staff regarding preparation of talking points (draft attached) | DP & WP | 8 |
| 91 | 1/6/06 | Emails among OLC attorneys regarding preparation of talking points in response to CRS Report (draft attached) | DP & WP | 5 |
| 92 | 1/7/06 - 1/10/06 | Emails among OLC, OLA, OPA, and White House staff regarding preparation of talking points in response to CRS report (draft attached) | DP & WP | 3 |
| 93 | 1/6/06 | Email among OLC attorneys regarding preparation of talking points in response to CRS report (draft attached) | DP & WP | 1 |
| 94 | 1/3/06 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 18 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 95 | 1/16/06 | Emails among OLC and White House attorneys regarding preparation of White Paper | DP & WP | 1 |
| 96 | 1/16/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 97 | 1/14/06 | Emails among OLC and White House attorneys regarding preparation of White Paper | DP & WP | 2 |
| 98 | 1/6/06 | Emails between OLC attorneys regarding preparation of talking points in response to CRS report (draft attached) | DP & WP | 1 |
| 99 | 1/6/06 | Email among OLC, OLA, and OPA staff regarding preparation of talking points in response to CRS Report (draft attached) | DP & WP | 1 |
| 100 | 1/6/06 | Emails among OLC, OLA, OPA, OAG, Office of the Vice President, and White House staff regarding preparation of talking points in response to CRS report (draft attached) | DP & WP | 11 |
| 101 | 1/18/06 | Email among OLC and OAG attorneys regarding preparation of White Paper | DP & WP | 1 |
| 102 | 1/18/06 | Emails among OLC and OAG attorneys regarding preparation of White Paper (draft attached) | DP & WP | 10 |
| 103 | 1/11/06 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 104 | 1/12/06 | Email among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 105 | 1/13/06 | Email among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 106 | 1/16/06 | Email between OLC and White House attorneys regarding preparation of White Paper | DP & WP | 1 |
| 107 | 1/17/06 | Emails among OLC and OSG attorneys regarding preparation of White Paper | DP & WP | 1 |
| 108 | 1/18/06 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 109 | 1/10/06 - 1/11/06 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 22 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 110 | 12/29/05 | Emails among OLC attorneys regarding preparation of White Paper, with handwritten marginalia by OLC attorney (draft attached) | DP & WP | 4 |
| 111 | 12/28/05 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 112 | 12/28/05 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP &W P | 1 |
| 113 | 1/2/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 114 | 12/29/06 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 115 | 12/30/05 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 116 | 12/30/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 117 | 12/21/05 - 12/22/06 | Emails among OLC attorneys regarding preparation of talking points (draft attached) | DP & WP | 3 |
| 118 | 12/29/05 - 12/30/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 119 | 12/30/05 - 12/31/05 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 120 | 12/31/05 | Emails among OLC attorneys regarding preparation of White Paper | DP &W P | 2 |
| 121 | 12/29/05 - 12/30/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 122 | 12/31/05 - 1/2/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 3 |
| 123 | 12/31/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 124 | 12/20/05 | Emails among OLC and White House attorneys regarding preparation of talking points | DP & WP | 2 |
| 125 | 12/21/05 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 2 |
| 126 | 12/23/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 127 | 12/17/05 | Emails among OLC, State and White House attorneys regarding preparation of possible question responses for Secretary of State Rice | DP & WP | 1 |
| 128 | 12/17/05 - 12/18/05 | Emails among OLC, State, and White House attorneys regarding preparation of possible question responses for Secretary of State Rice | DP & WP | 5 |
| 129 | 1/18/06 | Emails among OLC, ODAG, and USAO, EDVA attorneys regarding preparation of White Paper (draft attached) | DP & WP | 4 |
| 130 | 12/19/05 | Emails among OLC, OAG, OLP and White House attorneys regarding preparation of draft Presidential statement | DP & PC | 4 |
| 131 | 12/19/05 | Emails among OLC and OAG attorneys discussing Attorney General meeting with members of Congress about legal authority for the TSP | DP | 1 |
| 132 | 12/19/05 | Email between OLC and White House attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |
| 133 | 12/19/05 | Email between OLC and White House attorneys regarding preparation of talking points (draft attached) | DP &WP | 1 |
| 134 | 12/19/05 | Email among State, OLC, Office of the Vice President and White House attorneys discussing possibility of asking private individual to explain the TSP to the press and Congress | DP | 1 |
| 135 | 12/19/05 | Emails among OLC, OAG, and OLA attorneys coordinating review of draft Moschella letter | DP | 1 |
| 136 | 12/19/05 | Emails among OLC, ODAG, OIPR, and OLA attorneys regarding preparation of response to question from congressional staffer (appended) | DP & WP | 2 |
| 137 | 12/19/05 | Emails between OLC and OAG attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |
| 138 | 12/19/05 | Emails among White House and OLC attorneys and staff regarding preparation of talking points | DP & WP | 2 |
| 139 | 1/17/06 | Emails between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 2 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 140 | 12/19/05 | Email between OLC attorneys regarding preparation of Moschella letter | DP & WP | 2 |
| 141 | 1/19/06 | Email between OLC and White House attorneys regarding preparation of talking points | DP & WP | 1 |
| 142 | 12/19/05 | Emails among OLC, NSC, OAG, and White House attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |
| 143 | 12/19/05 - 12/20/05 | Emails between State attorney and OLC attorney and former OLC attorney (current law professor) concerning inquiry from Prof. Curtis Bradley | DP | 2 |
| 144 | 12/20/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 145 | 12/20/05 | Emails among OLC, NSC, OAG, and White House attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |
| 146 | 12/20/05 | Emails among OLC attorneys regarding personal reactions to public statements by Orin Kerr and Cass Sunstein | DP & WP | 1 |
| 147 | 12/21/05 | Emails among OLC and White House attorneys regarding preparation of Moschella letter | DP & WP | 1 |
| 148 | 12/20/05 | Emails among OLC attorneys regarding preparation of talking points | DP & WP | 1 |
| 149 | 12/20/05 | Emails among OLC attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |
| 150 | 12/20/05 | Email between OLC and OAG attorneys regarding preparation of Moschella letter | DP & WP | 2 |
| 151 | 12/20/05 | Emails among OLC attorneys regarding preparation of Moschella letter | DP & WP | 1 |
| 152 | 12/21/05 | Emails between OLC attorneys forwarding December 21, 2005 op-ed by Richard A. Posner | DP | 2 |
| 153 | 12/21/05 | Email among OLC, OAG, OLA, and OPA attorneys regarding preparation of Moschella letter and talking points (drafts attached) | DP & WP | 1 |
| 154 | 12/21/05 | Email between OLC and White House attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 155 | 12/21/05 | Email between OLC and White House attorneys regarding preparation of talking points | DP & WP | 1 |
| 156 | 12/21/05 | Emails among OLC and NSC attorneys regarding preparation of Moschella letter | DP & WP | 2 |
| 157 | 12/21/05 | Emails between OLC and OAG attorneys regarding preparation of Moschella letter and talking points | DP & WP | 1 |
| 158 | 12/21/05 | Emails between OLC and White House attorneys regarding preparation of Moschella letter | DP & WP | 1 |
| 159 | 12/21/05 | Emails among OLC and White House attorneys regarding preparation of talking points | DP & WP | 1 |
| 160 | 12/21/05 | Emails among OLC, OAG and White House attorneys regarding status of review of Moschella letter and talking points | DP | 1 |
| 161 | 12/21/05 | Email between OLC and OAG attorneys regarding status of review of Moschella letter and talking points | DP | 1 |
| 162 | 1/17/06 | Email among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 163 | 12/21/05 | Emails between OLC and White House attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |
| 164 | 12/21/05 | Email among OLC, OLA, OPA, and OAG staff regarding preparation of Moschella letter and talking points (drafts attached) | DP & WP | 1 |
| 165 | 12/21/05 | Emails among OLC, OLA, OAG and OPA staff regarding preparation of Moschella letter (draft attached) | DP & WP | 1 |
| 166 | 12/21/05 | Emails among OLC and White House attorneys regarding status of draft talking points | DP | 1 |
| 167 | 12/22/05 | Email between OLC, OAG, OPA, OLA and White House staff transmitting talking points (copy attached) | DP & WP | 1 |
| 168 | 12/22/05 | Emails between OLC and White House attorneys regarding preparation of talking points (copy attached) | DP & WP | 2 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 169 | 12/22/05 | Email between OLC, OAG, OPA, OLA and White House staff transmitting revised talking points (copy attached) | DP & WP | 4 |
| 170 | 12/22/05 | Email between OLC, OAG, and OLA attorneys and OPA staff transmitting talking points (copy attached) | DP & WP | 1 |
| 171 | 12/23/05 | Email between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 172 | 12/23/05 | Email among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 173 | 12/20/05 | Email among OLC attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |
| 174 | 12/20/05 | Emails among OLC attorneys regarding preparation of talking points | DP & WP | 5 |
| 175 | 12/27/05 | Email among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 4 |
| 176 | 12/28/05 | Email among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 2 |
| 177 | 12/20/05 | Emails between OLC attorneys regarding preparation of Moschella letter | DP & WP | 3 |
| 178 | 12/28/05 | Email between OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 179 | 12/28/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 180 | 12/28/05 | Email among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 181 | 12/20/05 | Email between OLC attorneys regarding preparation of Moschella letter | DP & WP | 1 |
| 182 | 12/28/05 | Email among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 183 | 12/28/05 | Email between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 4 |
| 184 | 12/29/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 185 | 12/29/05 | Email among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 186 | 12/30/05 | Email among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 187 | 1/2/06 | Email between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 188 | 1/2/06 | Email between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 189 | 1/3/06 | Emails among OLC attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |
| 190 | 1/17/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 191 | 1/3/06 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 2 |
| 192 | 1/3/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 193 | 1/3/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 194 | 1/3/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 195 | 1/3/06 | Email among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 196 | 1/3/06 | Email between OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 197 | 1/17/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 198 | 1/3/06 - 1/4/06 | Emails between OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 199 | 12/20/05 | Emails among OLC attorneys regarding preparation of talking points | DP & WP | 1 |
| 200 | 1/4/06 | Email among OLC, OLA, and OAG attorneys regarding preparing Attorney General for meeting with Senator Specter (draft attached) | DP & WP | 1 |
| 201 | 1/4/06 | Emails among OLC and White House staff regarding preparation of talking points (draft attached) | DP & WP | 5 |
| 202 | 1/4/06 - 1/5/06 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 2 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 203 | 1/17/06 | Emails between OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 204 | 1/5/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 205 | 1/5/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 206 | 1/5/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 207 | 1/5/06 | Email among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 208 | 1/5/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 209 | 1/6/06 | Emails among OLC, Office of the Vice President and White House attorneys regarding preparation of talking points | DP & WP | 1 |
| 210 | 1/6/06 | Email among OLC, Office of Vice President, DOD and White House attorneys regarding response to press inquiry concerning CRS report | DP | 1 |
| 211 | 1/6/06 | Emails among OLC, OLA, Office of Vice President, DOD and White House attorneys regarding response to press inquiry concerning CRS report | DP | 2 |
| 212 | 1/6/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 213 | 1/6/06 | Email between OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 214 | 1/6/06 | Emails between OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 215 | 1/17/06 | Emails between OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 216 | 1/9/06 | Emails between OLC and OLA attorneys regarding status of potential legislation | DP | 2 |
| 217 | 1/10/06 | Email among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 218 | 1/11/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 2 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 219 | 1/11/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 220 | 1/11/06 | Emails among OLC attorneys regarding Prof. Tribe's analysis | DP & WP | 1 |
| 221 | 1/11/06 | Emails among OLC, OPA, and OAG regarding Jeff Smith's and Prof. Tribe's analyses | DP & WP | 1 |
| 222 | 1/11/06 | Emails among OLC attorneys regarding Jeff Smith's and Prof. Tribe's analyses | DP & WP | 1 |
| 223 | 1/11/06 | Emails among OLC attorneys regarding Jeff Smith's analysis | DP & WP | 1 |
| 224 | 1/11/06 | Email among OLC, OPA, OLA, and OAG regarding Jeff Smith's and Prof. Tribe's analyses | DP & WP | 1 |
| 225 | 1/15/06 - 1/16/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 226 | 1/18/06 | Emails among OLC and OIPR attorneys regarding status of review of draft White Paper | DP | 1 |
| 227 | 12/22/05 | Emails among OLC and White House attorneys regarding status of review of draft talking points | DP | 1 |
| 228 | 1/13/06 | Email between OLC and OAG attorneys regarding preparation of White Paper with handwritten marginalia by OLC attorney | DP & WP | 1 |
| 229 | 1/13/06 | Emails among OLC and OLA attorneys regarding talking points for confirmation hearing (draft attached) | DP & WP | 1 |
| 230 | 12/22/05 - 1/12/06 | Emails among OLC and OLA attorneys regarding preparation of talking points for confirmation hearing (drafts attached) | DP & WP | 7 |
| 231 | 1/13/06 | Emails among OLC attorneys and staff regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 232 | 1/13/06 | Emails among OLC attorneys and staff regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 233 | 1/13/06 | Emails among OLC and OAG attorneys regarding preparation of White Paper, with handwritten marginalia by OLC attorney | DP & WP | 2 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 234 | 1/13/06 | Email between OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 235 | 1/13/06 | Emails among OLC attorneys regarding preparation of McCallum USA Today letter (draft attached) | DP & WP | 2 |
| 236 | 1/13/06 | Email between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 237 | 1/13/06 | Emails among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 238 | 1/14/06 | Emails among OLC and OAG attorneys regarding preparation of White Paper | DP & WP | 1 |
| 239 | 1/14/06 | Email between OLC and OAG attorneys regarding preparation of White Paper | DP & WP | 1 |
| 240 | 1/16/06 | Email between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 241 | 1/16/06 | Emails among OLC and ODNI attorneys regarding preparation of White Paper | DP & WP | 2 |
| 242 | 1/17/06 | Emails among OLC attorneys and White House staff regarding response to inquiry from ABC News | DP | 1 |
| 243 | 1/17/06 | Emails among OLC attorneys regarding response to inquiry from White House press office | DP | 1 |
| 244 | 1/17/06 | Emails among OLC, OPA and White House staff regarding preparation of responses to questions received by White House press office | DP | 1 |
| 245 | 12/21/05 | Emails between OLC and OAG attorneys regarding preparation of Moschella letter | DP & WP | 1 |
| 246 | 1/13/06 | Email among OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 247 | 1/18/06 | Email between OLC and OAG attorneys regarding preparation of White Paper | DP & WP | 2 |
| 248 | 1/18/06 | Email between OLC and OAG attorneys regarding preparation of White Paper, with handwritten marginalia by OLC attorney | DP & WP | 1 |
| 249 | 12/21/05 | Emails between OLC and White House attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 250 | 1/18/06 | Emails between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 251 | 1/11/06 | Email among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 252 | 1/18/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 253 | 1/18/06 | Email between OLC and OPA staff regarding preparation of Attorney General speech | DP | 1 |
| 254 | 1/19/06 | Email among OLC attorneys regarding preparation of White Paper | DP & WP | 1 |
| 255 | 12/23/05 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 44 |
| 256 | 12/22/05 | Emails between OLC attorneys coordinating meeting with Department officials and discussing news reports of FISA Court briefing | DP | 1 |
| 257 | 1/19/06 | Emails between OLC and White House attorneys regarding preparation of talking points | DP & WP | 1 |
| 258 | 1/19/06 | Emails between OLC and White House attorneys regarding preparation of talking points | DP & WP | 1 |
| 259 | 12/22/05 | Emails among OLC and White House attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |
| 260 | 1/19/06 - 1/20/06 | Emails among OLC, OPA, OLA and OAG staff regarding preparation of Attorney General speech (draft attached) | DP | 1 |
| 261 | 12/20/06 | Emails among OLC, NSC, OAG and White House attorneys regarding preparation of talking points (draft attached) | DP & WP | 4 |
| 262 | 12/20/06 | Emails among OLC attorneys discussing analysis contained in White Paper | DP & WP | 1 |
| 263 | 1/20/06 | Emails among OLC, OLA and ODAG regarding preparation of talking points for confirmation hearing (draft attached) | DP & WP | 2 |
| 264 | 1/20/06 | Emails among OLC attorneys discussing analysis contained in White Paper | DP & WP | 2 |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 265 | 12/22/05 | Emails between OLC and White House attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |
| 266 | 1/20/06 | Email between OLC and OIPR attorneys regarding legislation | DP & WP | 1 |
| 267 | 1/18/06 | Emails between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 268 | 1/1/06 | Emails between OLC attorneys regarding status of White Paper | DP | 1 |
| 269 | 1/3/06 | Email between OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 270 | 1/3/06 | Email between OLC attorneys forwarding guidelines discussing Fourth Amendment | DP | 2 |
| 271 | 1/3/06 | Emails between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 272 | 1/3/06 | Emails among OLC attorneys regarding preparation of White Paper | DP & WP | 2 |
| 273 | 1/4/06 | Email among OLC attorneys regarding status of revisions to White Paper | DP | 1 |
| 274 | 1/6/06 | Email among OLC, DOD, Office of Vice President and White House attorneys forwarding CRS report (document attached) | DP | 1 |
| 275 | 1/9/06 | Emails between OLC attorneys regarding preparation of White Paper (draft attached) | DP & WP | 1 |
| 276 | 12/22/05 | Emails between OLC and White House attorneys regarding preparation of talking points (draft attached) | DP & WP | 1 |
| 277 | Undated | OLC attorney's handwritten notes recording comments on draft White Paper by White House and NSC attorneys | DP & WP | 5 |
| 278 | 1/16/06 | Handwritten comments by White House attorney on draft White Paper | DP & WP | 6 |
| 279 | 12/20/05 - 1/20/06 | Talking points regarding legal authorities for NSA activities (about 15 drafts) | DP & WP | 50 (est.) |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 280 | 12/21/05 - 1/20/06 | White Paper (about 50 drafts) | DP & WP | 2500 (est.) |
| 281 | 12/23/05 - 12/29/05 | White Paper fragments, footnotes, etc. (about 10 drafts) | DP & WP | 50 (est.) |
| 282 | 1/6/06 - 1/10/06 | Talking points regarding CRS analysis (about 5 drafts) | DP & WP | 15 (est.) |
| 283 | 1/19/06 | Draft of Attorney General testimony | DP & WP | 3 |
| 284 | 12/20/05 | Attorney notes generated in preparation of White Paper | DP & WP | 4 |
| 285 | 1/13/06 | Draft of McCallum *USA Today* op-ed column | DP & WP | 3 |
| 286 | 1/18/06 | Draft of Attorney General cover letter for White Paper | DP & WP | 2 |
| 287 | 1/9/06 | Draft talking points | DP & WP | 2 |
| 288 | 1/18/06 | Draft talking points | DP & WP | 2 |
| 289 | 12/21/05 | Draft Moschella letter (about 10 drafts) | DP & WP | 30 (est.) |
| 290 | 1/18/06 | Draft answers to press questions | DP & WP | 3 |
| 291 | 1/31/06 | Draft responses to congressional questions | DP & WP | 11 |
| 292 | 1/31/06 | Draft of Attorney General testimony | DP & WP | 10 |

Legend:
CRIM - Criminal Division
DOD - Department of Defense
NSA - National Security Agency
NSC - National Security Council
OAG - Office of Attorney General
ODAG - Office of the Deputy Attorney General
ODNI - Office of Director of National Intelligence
OIPR - Office of Intelligence Policy and Review
OLA - Office of Legislative Affairs
OLC - Office of Legal Counsel
OLP - Office of Legal Policy
OPA - Office of Public Affairs
OSG - Office of Solicitor General
USAO, EDVA - United States Attorney's Office, Eastern District of Virginia