In the United States District Court
for the District of Columbia

JUDICIAL WATCH, INC.                )
                                    )
    Plaintiff,                      )
                                    )
v.                                  )      Civil No. 06-00406 (HHK)
UNITED STATES DEPARTMENT OF         )
JUSTICE,                            )
                                    )
    Defendant.                      )

## DECLARATION OF JAMES M. KOVAKAS

I, James M. Kovakas, make the following declaration under penalty of perjury.

1. I am Attorney-In-Charge of the Freedom of Information and Privacy Acts (FOI/PA) Office, Civil Division, Department of Justice. The FOI/PA Office responds to FOI/PA requests for records of the Civil Division, Department of Justice, made under the Freedom of Information Act (FOIA), 5 U.S.C. §552 (1994), as amended by the Electronic Freedom of Information Act Amendments of 1996, 5 U.S.C.A. §552, and/or the Privacy Act (PA), 5 U.S.C. §552a (1994). Pursuant to Civil Division Directive No. 137-80, I am authorized to exercise the authority of the Assistant Attorney General, Civil Division, to deny requests for records under 5 U.S.C. §§ 552 and 552a. My official duties include the supervision of all processing of such requests for Civil Division records. Pursuant to my duties I am familiar with the administrative procedures used in the processing of record requests under the FOIA and the PA at the Department of Justice.

My knowledge of the processing of plaintiffs' request which is at issue in this case results from my personal review of the document as well as information obtained in my official capacity.

## Administrative Processing of the Request

2.   By letter dated January 6, 2006, the Plaintiff Judicial Watch requested pursuant to the FOIA the following records: "1) Any and all legal opinions(s) and/or memorandum(s) regarding th authorization by President George W. Bush for the National Security Agency . . . to monitor domestic communications without court-approved warrants, referenced in the attached *New York Times* story. 2) A presidential order signed in 2002 allowing and/or instructing the NSA to monitor domestic communications without court-approved warrants . . . ." Judicial Watch also requested expedited processing of its request.  A copy of plaintiff's January 6, 2006 request is attached as Exhibit A.

3.   By letter dated January 18, 2006, I granted plaintiff's request for expedited processing.  A copy of my January 18, 2006 letter is attached as Exhibit B.

4.   By letter dated January 31, 2006, I advised plaintiff that as a result of our searches for records responsive to the request, we were unable to locate such records.  A copy of my January 31, 2006 letter is attached as Exhibit C.

5.   By letter dated March 30, 2006, plaintiff appealed my initial administrative determination and the Office of Information and Privacy advised plaintiff that its administrative

appeal was received.  Copies of plaintiff's March 30, 2006 appeal letter and OIP's acknowledgment are attached as Exhibit D.

6.  Pursuant to plaintiff's request for a second search, the Civil Division conducted another search for documents responsive to plaintiff's January 6, 2006 request.  As a result of this search the Civil Division located documents authored or originating from other components of the Department of Justice, specifically The Office of Public Affairs and Office of the Attorney General, Office of Legal Counsel, and Office of Intelligence and Policy Review.  I identified these documents in my letter and advised plaintiff of the FOIA officers to whom I referred the documents for disclosure determinations; these offices were asked to advise plaintiff of their respective disclosure determinations.  Finally, I advised plaintiff that the Civil Division identified one internal Civil Division electronic communication commenting on a draft of the White Paper which was exempt pursuant to the FOIA, 5 U.S.C. §552(b)(5).  A copy of my April 13, 2006 letter is attached as Exhibit E.

## Description of Document Withheld

7.  The document is an electronic communication dated January 13, 2006 from Carl Nichols, Deputy Assistant Attorney General of the Civil Division, to an attorney in the Office of Legal Counsel and attorneys in other offices of the department including the Office of the Attorney General, Office of the Solicitor General, Office of the Deputy Attorney General, Office of Intelligence and Policy

Review, and Criminal Division.  The email consists of four sentences in which Mr. Nichols comments on a draft of the white paper presenting legal authorities supporting the NSA activities described by the President.  He raises a possible issue to be considered before the white paper is finalized.  The document was withheld pursuant to the deliberative process privilege incorporated within the fifth exemption to disclosure under the FOIA.  It is exempt pursuant to the attorney work product privilege incorporated with Exemption 5 as well.  The email was exchanged only within the Department of Justice; it was sent from Carl Nichols (Civil Division) to Steve Bradbury, Office of Legal Counsel, Kyle Sampson (Office of the Attorney General), William Moschella (Office of the Deputy Attorney General), Courtney Elwood (Office of the Attorney General), James Baker (Office of Intelligence & Policy Review), Patrick Rowan (Office of the Deputy Attorney General), Paul D. Clement (Office of the Solicitor General), Peter Keisler (Assistant Attorney General, Civil Division), Alice Fisher (Assistant Attorney General, Criminal Division), Barry Sabin (Criminal Division), and Matthew Friedrich (Office of the Attorney General).

### Justification for Withholding

#### Deliberative Process Privilege

8.  As described above, the email was exchanged only among attorneys in offices of the United States Department of Justice. It is therefore an intra-agency document and meets the threshold

for withholding under 5 U.S.C. §552(b)(5).  The record is being withheld under the deliberative process privilege incorporated within this exemption to disclosure.  The deliberative process in this instance is the preparation of a memorandum outlining the legal authorities for supporting NSA activities.  The email predates the finalization of the memorandum or "white paper" on NSA activities and is therefore predecisional.  It reflects the suggestions of the Civil Division as to another issue the white paper might also address.  The email is therefore entirely deliberative and purely so.  It contains no segregable factual statements.

### Attorney Work Product Privilege

9.  This privilege protects the thoughts, opinions, and strategies of attorneys in preparing for litigation or possible litigation.  The document reflects an attorney's thoughts about a legal issue in the drafting of a "white paper" prepared in anticipation of litigation.  Litigation against the government challenging the merits of the Terrorist Surveillance Program was in fact initiated (see *ACLU v. NSA*, *CCR v. Bush*, and *Al-Haramain v. Bush*).  As such, the document reflects the preparation of Department attorneys in anticipated  litigation and clearly falls within the traditional meaning of attorney work product.

10.  I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this  *22nd*  day of January, 2007.

James M. Kovakas
Attorney-In-Charge
FOI/PA Office, Civil Division
Department of Justice

EXHIBIT A

Freedom of Information Act
Request

145-FOI-8607
#9507



IMMEDIATE RESPONSE
REQUESTED

**To:** James M. Kovakas    **From:** Mario Calabrese

**Fax:** 202-616-8202    **Date:** JAN. 0 6 2006

**Phone:**    **Pages:** 15 including Cover

**Re:** Freedom of Information Act
Request

☒ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☒ **Please Reply**

**Comments:** If you do not receive all pages, please call at 202-646-5172.

Original will follow by Certified

US Mail. Article Number:

7005 1160 0000 8544 7655

# URGENT

EXHIBIT A





IMMEDIATE RESPONSE
REQUESTED

<u>VIA FACSIMILE AND CERTIFIED U.S. MAIL</u>

January 6, 2006

Melanie Ann Pustay
Deputy Director
Office of Information and Privacy
US DEPARTMENT OF JUSTICE
Flag Building, Suite 570
Washington, DC 20530-0001
(Fax No.: 202-514-1009)
(Art. No.: 7005 1160 0000 8544 7617)

GayLa D. Sessoms, FOIA Coordinator
Office of Intelligence Policy and Review
US DEPARTMENT OF JUSTICE
Room 6150
950 Pennsylvania Avenue, N. W.
Washington, DC 20530-0001
(Fax. No.: 202-305-4211)
(Art. No.: 7005 1160 0000 8544 7631)

James M. Kovakas
Freedom of Info/PA Officer
Civil Division
US DEPARTMENT OF JUSTICE
Room 7304
20 Massachusetts Ave, NW
Washington, DC 20530-0001
(Fax. No.: 202-616-8202)
(Art. No.: 7005 1160 0000 8544 7655)

Patricia D. Harris
Management Analyst, FOIA/PA
Justice Management Division
US DEPARTMENT OF JUSTICE
National Place Building, Room 1070
Washington, DC 20530-0001
(Fax. No.: 202-307-1874)
(Art. No.: 7005 1160 0000 8544 7624)

Thomas J. McIntyre, Chief
FOIA/PA Unit
Criminal Division
US DEPARTMENT OF JUSTICE
Keeney Building, Suite 1127
Washington DC, 20530-0001
(Fax. No.: 202-514-6117)
(Art. No.: 7005 1160 0000 8544 7648)

Elizabeth Farris
Supervisory Paralegal
Office of Legal Counsel
US DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, N. W.
Room 5515
Washington, DC 20530-0001
(Fax. No.: 202-514-0563)
(Art. No.: 7005 1160 0000 8544 7662)

Re:  <u>Freedom of Information Act Request</u>

<u>EXPEDITED PROCESSING REQUESTED</u>

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 2


Dear Sir/Madam:

Pursuant to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests that the U. S. Department of Justice (hereafter "DOJ"); the Office of the Attorney General (hereafter "AG"); the Office of the Deputy Attorney General (hereafter "DAG"); the Office of the Associate Attorney General (hereafter "ASG"); the Office of Intelligence Policy and Review (hereafter "OIPR"); the Criminal Division (hereafter "Criminal Division"); the Civil Division (hereafter "Civil Division"); the Justice Management Division (hereafter "JMD"); the Office of Legal Counsel (hereafter "OLC"); and the Office of Legal Policy (hereafter "OLP") produce any and all agency records concerning, relating to, or reflecting the following subjects within ten (10) working days:

> 1) Any and all legal opinion(s) and/or memorandum(a) regarding the authorization by President George W. Bush for the National Security Agency (hereafter "NSA") to monitor domestic communications without court-approved warrants, referenced in the attached *New York Times* story[1]
>
> 2) A presidential order signed in 2002 allowing and/or instructing the NSA to monitor domestic communications without court-approved warrants, referenced in the attached New York Times story.[2]

For purpose of this request, the term "record" shall mean:  (1) any written, printed, or typed material of any kind, including without limitation all correspondence, memoranda, notes, messages, letters, cards, telegrams, teletypes, facsimiles, papers, forms, records, telephone messages, diaries, schedules, calendars, chronological data, minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns, computer printouts, printed matter, prospectuses, statements, checks, statistics, surveys, affidavits, contracts, agreements, transcripts, magazine or newspaper articles, or press releases; (2) any electronically, magnetically, or mechanically stored material of any kind, including without limitation all electronic mail or e-mail, meaning any electronically transmitted text or graphic communication created upon and transmitted or received by any computer or other electronic device, and all materials stored on compact disk, computer disk, diskette, hard drive, server, or tape; (3) any audio, aural, visual, or video records, recordings, or representations of any kind, including without limitation all cassette tapes,

---

[1] James Risen and Eric Lichtblau, "Bush Secretly lifted Some Limits on Spying in the US after 9/11, Officials Say," *The New York Times*, December 15, 2005

[2]        *Ibid*

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 3

compact disks, digital video disks, microfiche, microfilm, motion pictures, pictures, photographs, or videotapes; (4) any graphic materials and data compilations from which information can be obtained; (5) any materials using other means of preserving thought or expression; and (6) any tangible things from which data or information can be obtained, processed, recorded, or transcribed. The term "record" also shall mean any drafts, alterations, amendments, changes, or modifications of or to any of the foregoing.

**If you do not understand this request or any portion thereof, or if you feel you require clarification of this request or any portion thereof, please contact us immediately at 202-646-5172.**

If any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

**Judicial Watch, as a member of the news media, hereby requests expedited processing of this request, pursuant to 28 C. F. R. § 16.5(d)(ii)(iv).**

**Judicial Watch also hereby requests a waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii).**

Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media. Judicial Watch, Inc. regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and publishes and disseminates these works to the public. It intends to do likewise with the records it receives in response to this request.

As a member of the news media, Judicial Watch uses the following means, among others, to publish and disseminate its distinctive work to the public:

(1)    Judicial Watch maintains an Internet site, www.JudicialWatch.org, where the public can review records obtained through FOIA and read editorial works prepared by Judicial Watch, Inc., including news releases, based on FOIA materials. This website is viewed by over 20,000 people per day on average, and on several occasions, has logged up to 1,000,000 visitors in a single day.

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 4

(2)    Judicial Watch also publishes a monthly newsletter in which it publishes its own editorial works and presents, analyzes, and explains information it obtains through FOIA. Judicial Watch, Inc.'s newsletter is sent to approximately 140,000 individuals each month. The organization also utilizes an e-mail Infonet service that sends out updates of Judicial Watch's activities over the Internet to almost 14,00 persons.

(3)    Judicial Watch also periodically publishes and disseminates its own distinct works in the form of books and reports. For example, in September 1998 Judicial Watch, Inc. published the *Interim Report on Crimes and Other Offenses Committed by President Bill Clinton Warranting His Impeachment and Removal from Elected Office*. This 145-page report was accompanied by nearly 4,000 pages of supporting documentation and was crafted, in part, from the raw materials obtained by Judicial Watch through FOIA requests, among other regular means. In August 1999, Judicial Watch published *Filegate Status Report*, which is 136 pages long and is supported by nearly 1000 pages of documentation. In March 2001, Judicial Watch, Inc. published *The Judicial Watch Florida Recount*, an independent, non-partisan analysis of the results of Florida's hotly contested 2000 Presidential election based upon an sampling of ballots reviewed by Judicial Watch pursuant to Florida's version of FOIA. In February 2002, Judicial Watch published *The Judicial Watch 2002 "State of the Union" Report, Bush Administration Ethics Enforcement: "A Failure of Leadership."* In September 2002, Judicial Watch, Inc. published *Fatal Neglect: The U.S. Government's Continuing Failure to Protect American Citizens from Terrorists*. Most recently on November 21, 2003, Judicial Watch produced *Analysis of GAO Testimony: US Postal Service – Clear Communication With Employees Needed Before Reopening of Brentwood Facility*. (GAO-04-2057T/October 23, 2003). Comptroller General of the United States David M. Walker, in a reply to Judicial Watch's *Analysis of GAO Testimony*, wrote on December 17, 2003, "We view Judicial Watch as an important accountability organization in Washington, D.C." On February 16, 2005 Judicial Watch was rated by the highly respected capitol newspaper *The Hill* as being one of the nation's top ten "watchdogs." Most recently, on June 29, 2005, Judicial Watch produced a special report US Border Patrol Survey Analysis, a report of an analysis of documents produced under FOIA.

Judicial Watch also publishes and disseminates its distinctive work by participating in public conferences and seminars, including its own "Ethics in Government" conferences held in Pasadena, California (1999), Washington, DC (2000), and Miami, FL (2001). Judicial Watch also works with other media organizations to publish and disseminate distinctive work to the public, and representatives of Judicial Watch appear frequently on nationally broadcast television and radio programs. Judicial Watch has been granted press credentials at a number of national conventions and other events.

Consequently, Judicial Watch qualifies for a waiver of search fees as a member of the news media. *See National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381, 1387

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 5


(D.C. Cir. 1989). In fact, Judicial Watch has been recognized as a member of the news media in other FOIA litigation. *See Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000).

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

> shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch ongoing efforts to monitor the operations and activities of the federal government and to educate the public about these operations and activities, and, in particular, as part of an investigation into the facts and circumstances surrounding the President's authorization of the NSA to conduct eavesdropping on the American public without consulting the proper courts under the Foreign Intelligence Surveillance Act (hereafter "FISA").

Courts applying the "public interest" fee waiver provision of FOIA typically take into account four factors in determining whether to grant a waiver: (1) whether the subject of the requested records concerns the operations or activities of government; (2) whether disclosure of the requested records is likely to contribute to an understanding of government operations or activities; (3) whether disclosure of the requested records will contribute to a "reasonably broad" audience and whether the requestor has the "ability and intention" to disseminate the information to the public; and (4) whether disclosure of the requested record will contribute "significantly" to the public understanding. *See D.C. Technical Assistance Org. v. HUD*, 85 F. Supp.2d 46, 48-49 (D.D.C. 2000); 28 C.F.R. § 16.11(k)(2)(i)-(iv). Request for "public interest" waivers are to be judged on a case-by-case basis." *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988).

Without question, the subject-matter of the request concerns the operations and activities of government, namely the legal decision made by the President to authorize such domestic spying and wiretapping, circumventing the FISA court.

Disclosure of the requested records is likely to contribute to an understanding of government operations and activities and will appeal to a "reasonably broad" audience because

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 6

the records relate directly to the facts and circumstances surrounding the legal decision to authorize or allow such domestic spying.

Indeed, the taxpaying American public deserves full disclosure of the facts and circumstances surrounding the Bush Administration's decision, which has cause nation-wide controversy, over his administration's decision to allow and or conduct such spying on American phone lines. Legal scholars have charged that the administration decision is the most striking example of executive overreach, claiming that the surveillance being conducted should rightly be approved by the FISA court giving normal due-process to American citizens and others whose communications may be monitored by the NSA and passed on to other law enforcement agencies. The decision which is the subject of this requested disclosure of records is currently a national news story which has dominated headlines for days. It is obviously a concern to more than a "reasonably broad" section of the American public, all of whom enjoy constitutional protection and presumption of innocence in their communications over the phone and elsewhere with regard to government searches. This disclosure will undoubtedly "significantly enhance" their understanding of this particular operation and activity of government, by demonstrating how these decisions regarding the wiretapping of phone calls was made.

Expedited Processing of this request is clearly warranted in light of the widespread public and media attention being given to this story, because of the questions of the governments integrity with regards to the constitutionality of these actions, and which effects public confidence.

Once Judicial Watch obtains the requested records, it intends to analyze them and disseminate the results of its analysis, as well as the records themselves, as a special written report. Judicial Watch will also educate the public via radio programs, Judicial Watch's website, and/or newsletter, among other outlets. It also will make the records available to other members of the media or researchers upon request. Judicial Watch has a proven ability to disseminate information obtained through FOIA to the public, as demonstrated by its long-standing and continuing public outreach efforts, including radio and television programs, website, newsletter, periodic published reports, public appearances, and other educational undertakings.

Finally, disclosure of the requested records will contribute significantly to the public's understanding because relatively little is known about the program in question. The records requested by Judicial Watch undoubtedly will shed additional light on this important matter.

**In accordance with 28 C. F. R. § 16.5 (d)(1)(3), Judicial Watch certifies to be true and correct to the best of its knowledge and belief that it has, as a member of the media, a compelling "urgency to inform the public about an actual or alleged federal government activity," *see* 28 C. F. R. § 16.5 (d)(1)(ii). Additionally this is "on a matter of widespread**

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 7

**and exceptional media interest in which there exists possible questions about the government's integrity which affect public confidence" 28 C. F. R. § 16.5 (d)(1)(ii).**

Given these compelling circumstances, Judicial Watch is entitled to a public interest fee waiver of both search costs and duplication costs. Nonetheless, in the event our request for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to $350.00 in search and/or duplication costs. Judicial Watch requests that it be contacted before any such costs are incurred, in order to prioritize search and duplication efforts.

We look forward to receiving the requested documents and a waiver of both search and duplication costs within ten (10) business days.

Sincerely,

JUDICIAL WATCH, INC.

Christopher J. Farrell

CJF/mac

December 15, 2005

# Bush Secretly Lifted Some Limits on Spying in U.S. After 9/11, Officials Say

By JAMES RISEN
and ERIC LICHTBLAU

Washington - Months after the Sept. 11 attacks, President Bush secretly authorized the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without the court-approved warrants ordinarily required for domestic spying, according to government officials.

Under a presidential order signed in 2002, the intelligence agency has monitored the international telephone calls and international e-mail messages of hundreds, perhaps thousands, of people inside the United States without warrants over the past three years in an effort to track possible "dirty numbers" linked to Al Qaeda, the officials said. The agency, they said, still seeks warrants to monitor entirely domestic communications.

The previously undisclosed decision to permit some eavesdropping inside the country without court approval represents a major shift in American intelligence-gathering practices, particularly for the National Security Agency, whose mission is to spy on communications abroad. As a result, some officials familiar with the continuing operation have questioned whether the surveillance has stretched, if not crossed, constitutional limits on legal searches.

"This is really a sea change," said a former senior official who specializes in national security law. "It's almost a mainstay of this country that the N.S.A. only does foreign searches."

Nearly a dozen current and former officials, who were granted anonymity because of the classified nature of the program, discussed it with reporters for The New York Times because of their concerns about the operation's legality and oversight.

According to those officials and others, reservations about aspects of the program have also been expressed by Senator John D. Rockefeller IV, the West Virginia Democrat who is the vice chairman of the Senate Intelligence Committee, and a judge presiding over a secret court that oversees intelligence matters. Some of the questions about the agency's new powers led the administration to temporarily suspend the operation last year and impose more restrictions, the officials said.

The Bush administration views the operation as necessary so that the agency can move quickly to monitor communications that may disclose threats to this country, the officials said. Defenders

of the program say it has been a critical tool in helping disrupt terrorist plots and prevent attacks inside the United States.

Administration officials are confident that existing safeguards are sufficient to protect the privacy and civil liberties of Americans, the officials say. In some cases, they said, the Justice Department eventually seeks warrants if it wants to expand the eavesdropping to include communications confined within the United States. The officials said the administration had briefed Congressional leaders about the program and notified the judge in charge of the Foreign Intelligence Surveillance Court, the secret Washington court that deals with national security issues.

The White House asked The New York Times not to publish this article, arguing that it could jeopardize continuing investigations and alert would-be terrorists that they might be under scrutiny. After meeting with senior administration officials to hear their concerns, the newspaper delayed publication for a year to conduct additional reporting. Some information that administration officials argued could be useful to terrorists has been omitted.

While many details about the program remain secret, officials familiar with it said the N.S.A. eavesdropped without warrants on up to 500 people in the United States at any given time. The list changes as some names are added and others dropped, so the number monitored in this country may have reached into the thousands over the past three years, several officials said. Overseas, about 5,000 to 7,000 people suspected of terrorist ties are monitored at one time, according to those officials.

Several officials said the eavesdropping program had helped uncover a plot by Iyman Faris, an Ohio trucker and naturalized citizen who pleaded guilty in 2003 to supporting Al Qaeda by planning to bring down the Brooklyn Bridge with blowtorches. What appeared to be another Qaeda plot, involving fertilizer bomb attacks on British pubs and train stations, was exposed last year in part through the program, the officials said. But they said most people targeted for N.S.A. monitoring have never been charged with a crime, including an Iranian-American doctor in the South who came under suspicion because of what one official described as dubious ties to Osama bin Laden.

Dealing with a New Threat

The eavesdropping program grew out of concerns after the Sept. 11 attacks that the nation's intelligence agencies were not poised to deal effectively with the new threat of Al Qaeda and that they were handcuffed by legal and bureaucratic restrictions better suited to peacetime than war, according to officials. In response, President Bush significantly eased limits on American intelligence and law enforcement agencies and the military.

But some of the administration's antiterrorism initiatives have provoked an outcry from members of Congress, watchdog groups, immigrants and others who argue that the measures erode protections for civil liberties and intrude on Americans' privacy. Opponents have challenged provisions of the USA Patriot Act, the focus of contentious debate on Capitol Hill this week, that expand domestic surveillance by giving the Federal Bureau of Investigation more power to collect information like library lending lists or Internet use. Military and F.B.I. officials have drawn criticism for monitoring what were largely peaceful antiwar protests. The Pentagon and

the Department of Homeland Security were forced to retreat on plans to use public and private databases to hunt for possible terrorists. And last year, the Supreme Court rejected the administration's claim that those labeled "enemy combatants" were not entitled to judicial review of their open-ended detention.

Mr. Bush's executive order allowing some warrantless eavesdropping on those inside the United States including American citizens, permanent legal residents, tourists and other foreigners is based on classified legal opinions that assert that the president has broad powers to order such searches, derived in part from the September 2001 Congressional resolution authorizing him to wage war on Al Qaeda and other terrorist groups, according to the officials familiar with the N.S.A. operation.

The National Security Agency, which is based at Fort Meade, Md., is the nation's largest and most secretive intelligence agency, so intent on remaining out of public view that it has long been nicknamed "No Such Agency." It breaks codes and maintains listening posts around the world to eavesdrop on foreign governments, diplomats and trade negotiators as well as drug lords and terrorists. But the agency ordinarily operates under tight restrictions on any spying on Americans, even if they are overseas, or disseminating information about them.

What the agency calls a "special collection program" began soon after the Sept. 11 attacks, as it looked for new tools to attack terrorism. The program accelerated in early 2002 after the Central Intelligence Agency started capturing top Qaeda operatives overseas, including Abu Zubaydah, who was arrested in Pakistan in March 2002. The C.I.A. seized the terrorists' computers, cellphones and personal phone directories, said the officials familiar with the program. The N.S.A. surveillance was intended to exploit those numbers and addresses as quickly as possible, the officials said.

In addition to eavesdropping on those numbers and reading e-mail messages to and from the Qaeda figures, the N.S.A. began monitoring others linked to them, creating an expanding chain. While most of the numbers and addresses were overseas, hundreds were in the United States, the officials said.

Under the agency's longstanding rules, the N.S.A. can target for interception phone calls or e-mail messages on foreign soil, even if the recipients of those communications are in the United States. Usually, though, the government can only target phones and e-mail messages in this country by first obtaining a court order from the Foreign Intelligence Surveillance Court, which holds its closed sessions at the Justice Department.

Traditionally, the F.B.I., not the N.S.A., seeks such warrants and conducts most domestic eavesdropping. Until the new program began, the N.S.A. typically limited its domestic surveillance to foreign embassies and missions in Washington, New York and other cities, and obtained court orders to do so.

Since 2002, the agency has been conducting some warrantless eavesdropping on people in the United States who are linked, even if indirectly, to suspected terrorists through the chain of phone numbers and e-mail addresses, according to several officials who know of the operation. Under the special program, the agency monitors their international communications, the officials

said. The agency, for example, can target phone calls from someone in New York to someone in Afghanistan.

Warrants are still required for eavesdropping on entirely domestic-to-domestic communications, those officials say, meaning that calls from that New Yorker to someone in California could not be monitored without first going to the Federal Intelligence Surveillance Court.

A White House Briefing

After the special program started, Congressional leaders from both political parties were brought to Vice President Dick Cheney's office in the White House. The leaders, who included the chairmen and ranking members of the Senate and House intelligence committees, learned of the N.S.A. operation from Mr. Cheney, Gen. Michael V. Hayden of the Air Force, who was then the agency's director and is now the principal deputy director of national intelligence, and George J. Tenet, then the director of the C.I.A., officials said.

It is not clear how much the members of Congress were told about the presidential order and the eavesdropping program. Some of them declined to comment about the matter, while others did not return phone calls.

Later briefings were held for members of Congress as they assumed leadership roles on the intelligence committees, officials familiar with the program said. After a 2003 briefing, Senator Rockefeller, the West Virginia Democrat who became vice chairman of the Senate Intelligence Committee that year, wrote a letter to Mr. Cheney expressing concerns about the program, officials knowledgeable about the letter said. It could not be determined if he received a reply. Mr. Rockefeller declined to comment. Aside from the Congressional leaders, only a small group of people, including several cabinet members and officials at the N.S.A., the C.I.A. and the Justice Department, know of the program.

Some officials familiar with it say they consider warrantless eavesdropping inside the United States to be unlawful and possibly unconstitutional, amounting to an improper search. One government official involved in the operation said he privately complained to a Congressional official about his doubts about the legality of the program. But nothing came of his inquiry. "People just looked the other way because they didn't want to know what was going on." he said.

A senior government official recalled that he was taken aback when he first learned of the operation. "My first reaction was, 'We're doing what?'" he said. While he said he eventually felt that adequate safeguards were put in place, he added that questions about the program's legitimacy were understandable.

Some of those who object to the operation argue that is unnecessary. By getting warrants through the foreign intelligence court, the N.S.A. and F.B.I. could eavesdrop on people inside the United States who might be tied to terrorist groups without skirting longstanding rules, they say.

court has turned down only a small number of requests over the years. In 2004, according to the Justice Department, 1,754 warrants were approved. And the Foreign Intelligence Surveillance Court can grant emergency approval for wiretaps within hours, officials say.

Administration officials counter that they sometimes need to move more urgently, the officials said. Those involved in the program also said that the N.S.A.'s eavesdroppers might need to start monitoring large batches of numbers all at once, and that it would be impractical to seek permission from the Foreign Intelligence Surveillance Court first, according to the officials.

Culture of Caution and Rules

The N.S.A. domestic spying operation has stirred such controversy among some national security officials in part because of the agency's cautious culture and longstanding rules.

Widespread abuses including eavesdropping on Vietnam War protesters and civil rights activists by American intelligence agencies became public in the 1970's and led to passage of the Foreign Intelligence Surveillance Act, which imposed strict limits on intelligence gathering on American soil. Among other things, the law required search warrants, approved by the secret F.I.S.A. court, for wiretaps in national security cases. The agency, deeply scarred by the scandals, adopted additional rules that all but ended domestic spying on its part.

After the Sept. 11 attacks, though, the United States intelligence community was criticized for being too risk-averse. The National Security Agency was even cited by the independent 9/11 Commission for adhering to self-imposed rules that were stricter than those set by federal law.

Several senior government officials say that when the special operation first began, there were few controls on it and little formal oversight outside the N.S.A. The agency can choose its eavesdropping targets and does not have to seek approval from Justice Department or other Bush administration officials. Some agency officials wanted nothing to do with the program, apparently fearful of participating in an illegal operation, a former senior Bush administration official said. Before the 2004 election, the official said, some N.S.A. personnel worried that the program might come under scrutiny by Congressional or criminal investigators if Senator John Kerry, the Democratic nominee, was elected president.

In mid-2004, concerns about the program expressed by national security officials, government lawyers and a judge prompted the Bush administration to suspend elements of the program and revamp it.

For the first time, the Justice Department audited the N.S.A. program, several officials said. And to provide more guidance, the Justice Department and the agency expanded and refined a checklist to follow in deciding whether probable cause existed to start monitoring someone's communications, several officials said.

A complaint from Judge Colleen Kollar-Kotelly, the federal judge who oversees the Federal Intelligence Surveillance Court, helped spur the suspension, officials said. The judge questioned whether information obtained under the N.S.A. program was being improperly used as the basis for F.I.S.A. wiretap warrant requests from the Justice Department, according to senior government officials. While not knowing all the details of the exchange, several government lawyers said there appeared to be concerns that the Justice Department, by trying to shield the existence of the N.S.A. program, was in danger of misleading the court about the origins of the information cited to justify the warrants.

One official familiar with the episode said the judge insisted to Justice Department lawyers at one point that any material gathered under the special N.S.A. program not be used in seeking wiretap warrants from her court. Judge Kollar-Kotelly did not return calls for comment.

A related issue arose in a case in which the F.B.I. was monitoring the communications of a terrorist suspect under a F.I.S.A.-approved warrant, even though the National Security Agency was already conducting warrantless eavesdropping. According to officials, F.B.I. surveillance of Mr. Faris, the Brooklyn Bridge plotter, was dropped for a short time because of technical problems. At the time, senior Justice Department officials worried what would happen if the N.S.A. picked up information that needed to be presented in court. The government would then either have to disclose the N.S.A. program or mislead a criminal court about how it had gotten the information.

The Civil Liberties Question

Several national security officials say the powers granted the N.S.A. by President Bush go far beyond the expanded counterterrorism powers granted by Congress under the USA Patriot Act, which is up for renewal. The House on Wednesday approved a plan to reauthorize crucial parts of the law. But final passage has been delayed under the threat of a Senate filibuster because of concerns from both parties over possible intrusions on Americans' civil liberties and privacy.

Under the act, law enforcement and intelligence officials are still required to seek a F.I.S.A. warrant every time they want to eavesdrop within the United States. A recent agreement reached by Republican leaders and the Bush administration would modify the standard for F.B.I. wiretap warrants, requiring, for instance, a description of a specific target. Critics say the bar would remain too low to prevent abuses.

Bush administration officials argue that the civil liberties concerns are unfounded, and they say pointedly that the Patriot Act has not freed the N.S.A. to target Americans. "Nothing could be further from the truth," wrote John Yoo, a former official in the Justice Department's Office of Legal Counsel, and his co-author in a Wall Street Journal opinion article in December 2003. Mr. Yoo worked on a classified legal opinion on the N.S.A.'s domestic eavesdropping program.

At an April hearing on the Patriot Act renewal, Senator Barbara A. Mikulski, Democrat of Maryland, asked Attorney General Alberto R. Gonzales and Robert S. Mueller III, the director of the F.B.I., "Can the National Security Agency, the great electronic snooper, spy on the American people?"

"Generally," Mr. Mueller said, "I would say generally, they are not allowed to spy or to gather information on American citizens." President Bush did not ask Congress to include provisions for the N.S.A. domestic surveillance program as part of the Patriot Act and has not sought any other laws to authorize the operation. Bush administration lawyers argued that such new laws were unnecessary, because they believed that the Congressional resolution on the campaign against terrorism provided ample authorization, officials said.

Seeking Congressional approval was also viewed as politically risky because the proposal would be certain to face intense opposition on civil liberties grounds. The administration also feared

that by publicly disclosing the existence of the operation, its usefulness in tracking terrorists would end, officials said.

The legal opinions that support the N.S.A. operation remain classified, but they appear to have followed private discussions among senior administration lawyers and other officials about the need to pursue aggressive strategies that once may have been seen as crossing a legal line, according to senior officials who participated in the discussions.

For example, just days after the Sept. 11, 2001, attacks on New York and the Pentagon, Mr. Yoo, the Justice Department lawyer, wrote an internal memorandum that argued that the government might use "electronic surveillance techniques and equipment that are more powerful and sophisticated than those available to law enforcement agencies in order to intercept telephonic communications and observe the movement of persons but without obtaining warrants for such uses."

Mr. Yoo noted that while such actions could raise constitutional issues, in the face of devastating terrorist attacks "the government may be justified in taking measures which in less troubled conditions could be seen as infringements of individual liberties."

The next year, Justice Department lawyers disclosed their thinking on the issue of warrantless wiretaps in national security cases in a little-noticed brief in an unrelated court case. In that 2002 brief, the government said that "the Constitution vests in the President inherent authority to conduct warrantless intelligence surveillance (electronic or otherwise) of foreign powers or their agents, and Congress cannot by statute extinguish that constitutional authority."

Administration officials were also encouraged by a November 2002 appeals court decision in an unrelated matter. The decision by the Foreign Intelligence Surveillance Court of Review, which sided with the administration in dismantling a bureaucratic "wall" limiting cooperation between prosecutors and intelligence officers, noted "the president's inherent constitutional authority to conduct warrantless foreign intelligence surveillance."

But the same court suggested that national security interests should not be grounds "to jettison the Fourth Amendment requirements" protecting the rights of Americans against undue searches. The dividing line, the court acknowledged, "is a very difficult one to administer."

EXHIBIT B

**U.S. Department of Justice**

Civil Division

---

*Washington, D.C. 20530*

JMK:jk:145-FOI-8607                    January 18, 2006

Christopher J. Farrell, Esq.
Judicial Watch
501 School Street, SW, 5th Floor
Washington, D.C. 20024

Dear Mr. Farrell:

This letter acknowledges receipt of your January 6, 2006 request made pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. §552.

We received your request in this office on January 9, 2006 and assigned control number 145-FOI-8607 to your request.

Pursuant to your request for expedited processing, I reviewed your request under departmental regulations at 28 CFR 16.5(d). As a result of my review of your request, I grant you expedited processing of your request pursuant to 28 CFR 16.5(d)(1)(iv).

Sincerely,

*James M. Kovakas*

James M. Kovakas
Attorney In Charge
FOI/PA Office, Civil Division

EXHIBIT B

EXHIBIT C

U.S. Department of Justice

Civil Division

Washington, D.C. 20530

JMK:jk:145-FOI-8607                    January 31, 2006

Christopher J. Farrell, Esq.
Judicial Watch
501 School Street, SW, 5th Floor
Washington, D.C. 20024

Dear Mr. Farrell:

     This letter responds to your January 6, 2006 request made
pursuant to the Freedom of Information Act (FOIA),
5 U.S.C. §552, for all records concerning, relating, or
reflecting the following subjects:

     1) All legal opinions and/or memoranda regarding
authorization by President Bush for the National Security Agency
(NSA) to monitor domestic communications without court-approved
warrants; and

     2) A presidential order signed in 2002 allowing and/or
instructing the NSA to monitor domestic communications without
court-approved warrants.

     Pursuant to your request, we contacted all Directors as well
as the Deputy Assistant Attorney General and asked that they
advise us of any records responsive to your request maintained by
their offices.  As a result of these searches, we determined that
the Civil Division has no records responsive to your request.

EXHIBIT C

-2-

If you have questions regarding this response, please contact me at (202) 514-3319 or Jean Kornblut of my staff at (202) 514-2319.

Sincerely,

James M. Kovakas
Attorney In Charge
FOI/PA Office, Civil Division

EXHIBIT D



**U.S. Department of Justice**

Office of Information and Privacy

---

*Telephone: (202) 514-3642*                    *Washington, D.C. 20530*

Mr. Christopher J. Farrell                    APR 1 0 2006
Judicial Watch, Inc.
501 School Street SW., Suite 500
Washington, DC 20024

    Re:  Request No. 145-FOI-8607

Dear Mr. Farrell:

    This is to advise you that your administrative appeal from the action of the Civil Division was received by this Office on March 31, 2006.

    The Office of Information and Privacy, which has the responsibility of adjudicating such appeals, has a substantial backlog of pending appeals received prior to yours. In an attempt to afford each appellant equal and impartial treatment, we have adopted a general practice of assigning appeals in the approximate order of receipt. Your appeal has been assigned number **06-1651**. Please mention this number in any future correspondence to this Office regarding this matter.

    We will notify you of the decision on your appeal as soon as we can. We regret the necessity of this delay and appreciate your continued patience.

                    Sincerely,

                    Priscilla Jones
                    Chief, Administrative Staff

**EXHIBIT D**

Civil



*rec'd 3-31-06*

*06-1651*

*FOIA*
*(A)*
*Civ*
*more*



### Freedom of Information Act Appeal

| **To:** CO-DIRECTOR O I P | **From:** Mario Calabrese |
|---|---|
| **Fax:** 202-514-1009 | **Date:** MAR. 30 2006 |
| **Phone:** | **Pages:** 15 including cover |

**Re:** Freedom of Information Act Appeal

☒ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☒ **Please Reply**

**Comments:** If you do not receive all pages, please call at 202-646-5172.

Freedom of Information Act Appeal

Original will follow by Certified
US Mail. Article Number:
7005 0390 0004 0892 3011

OFFICE OF INFORMATION
AND PRIVACY

MAR 3 1 2006

RECEIVED

# Judicial Watch™

*Because no one is above the law!*

<u>**VIA FACSIMILE AND CERTIFIED US MAIL**</u>

March 30, 2006

Co-Director
Office of Information and Privacy
US DEPARTMENT OF JUSTICE
1425 New York Avenue, N. W.
Suite 11, 050
Washington, DC  20530-0001
(Fax. No.: 202-514-1009)
(Art. No.: 7005 0390 0004 0892 3011)

<u>**Re: Appeal of Freedom of Information Act request**</u>

<u>**JMK: jk: 145-FOI-8607**</u>

Dear Sir/Madam:

On January 6, 2006, Judicial Watch Inc. filed a Freedom of Information Act (hereafter "FOIA") request with the US Department of Justice Civil Division (hereafter "Civil Division") requesting all documents that refer or relate in any way to legal memoranda regarding President Bush's authorization of the monitoring of domestic communications by the National Security Agency (hereafter "NSA") without a warrant. (*See* Exhibit 1, attached)

In a response letter, James M. Kovakas, Attorney in Charge, FOI/PA Office of the Civil Division, stated "Pursuant to your request, we contacted all Directors as well as the Deputy Assistant Attorney General and asked that they advise us of any records responsive to your request.  As a result of these searched, we determined that the Civil Division has no records responsive to your request." (*See* Exhibit 2, attached)

This letter respectfully appeals the determination of Mr. Kovakas.

It is highly unlikely that documents regarding President Bush's controversial authorization of domestic communications monitoring do not exist in the Civil Division, which would have a policy interest in the exercise and implications of such policies resulting from the requested memorandum.  Judicial Watch hereby requests a second search of

---

Judicial Watch FOIA appeal
of Civil Division determination
March 30, 2006
P. 2.


the Civil Division and full access to documents responsive to its FOIA request of January 6,
2006.

Sincerely,

JUDICIAL WATCH, INC.


Christopher J. Farrell

CJF/mac

# EXHIBIT ONE



**Judicial Watch™**
*Because no one is above the law!*

IMMEDIATE RESPONSE
REQUESTED

<u>**VIA FACSIMILE AND CERTIFIED U.S. MAIL**</u>

January 6, 2006

**COPY**

Melanie Ann Pustay
Deputy Director
Office of Information and Privacy
US DEPARTMENT OF JUSTICE
Flag Building, Suite 570
Washington, DC 20530-0001
(Fax No.: 202-514-1009)
(Art. No.: 7005 1160 0000 8544 7617)

Patricia D. Harris
Management Analyst, FOIA/PA
Justice Management Division
US DEPARTMENT OF JUSTICE
National Place Building, Room 1070
Washington, DC 20530-0001
(Fax. No.: 202-307-1874)
(Art. No.: 7005 1160 0000 8544 7624)

GayLa D. Sessoms, FOIA Coordinator
Office of Intelligence Policy and Review
US DEPARTMENT OF JUSTICE
Room 6150
950 Pennsylvania Avenue, N. W.
Washington, DC 20530-0001
(Fax. No.: 202-305-4211)
(Art. No.: 7005 1160 0000 8544 7631)

Thomas J. McIntyre, Chief
FOIA/PA Unit
Criminal Division
US DEPARTMENT OF JUSTICE
Keeney Building, Suite 1127
Washington DC, 20530-0001
(Fax. No.: 202-514-6117)
(Art. No.: 7005 1160 0000 8544 7648)

James M. Kovakas
Freedom of Info/PA Officer
Civil Division
US DEPARTMENT OF JUSTICE
Room 7304
20 Massachusetts Ave, NW
Washington, DC 20530-0001
(Fax. No.: 202-616-8202)
(Art. No.: 7005 1160 0000 8544 7655)

Elizabeth Farris
Supervisory Paralegal
Office of Legal Counsel
US DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, N. W.
Room 5515
Washington, DC 20530-0001
(Fax. No.: 202-514-0563)
(Art. No.: 7005 1160 0000 8544 7662)

Re:  <u>**Freedom of Information Act Request**</u>

<u>**EXPEDITED PROCESSING REQUESTED**</u>

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 2

Dear Sir/Madam:

      Pursuant to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests that the U. S. Department of Justice (hereafter "DOJ"); the Office of the Attorney General (hereafter "AG"); the Office of the Deputy Attorney General (hereafter "DAG"); the Office of the Associate Attorney General (hereafter "ASG"); the Office of Intelligence Policy and Review (hereafter "OIPR"); the Criminal Division (hereafter "Criminal Division"); the Civil Division (hereafter "Civil Division"); the Justice Management Division (hereafter "JMD"); the Office of Legal Counsel (hereafter "OLC"); and the Office of Legal Policy (hereafter "OLP") produce any and all agency records concerning, relating to, or reflecting the following subjects within ten (10) working days:

      1) Any and all legal opinion(s) and/or memorandum(a) regarding the authorization by President George W. Bush for the National Security Agency (hereafter "NSA") to monitor domestic communications without court-approved warrants, referenced in the attached *New York Times* story[1]

      2) A presidential order signed in 2002 allowing and/or instructing the NSA to monitor domestic communications without court-approved warrants, referenced in the attached New York Times story.[2]

      For purpose of this request; the term "record" shall mean: (1) any written, printed, or typed material of any kind, including without limitation all correspondence, memoranda, notes, messages, letters, cards, telegrams, teletypes, facsimiles, papers, forms, records, telephone messages, diaries, schedules, calendars, chronological data, minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns, computer printouts, printed matter, prospectuses, statements, checks, statistics, surveys, affidavits, contracts, agreements, transcripts, magazine or newspaper articles, or press releases; (2) any electronically, magnetically, or mechanically stored material of any kind, including without limitation all electronic mail or e-mail, meaning any electronically transmitted text or graphic communication created upon and transmitted or received by any computer or other electronic device, and all materials stored on compact disk, computer disk, diskette, hard drive, server, or tape; (3) any audio, aural, visual, or video records, recordings, or representations of any kind, including without limitation all cassette tapes,

---

[1] James Risen and Eric Lichtblau. "Bush Secretly lifted Some Limits on Spying in the US after 9/11, Officials Say," *The New York Times*. December 15, 2005

[2]     *Ibid*

501 School Street, SW • Suite 500 • Washington, DC 20024 • Tel: (202) 646-5172 • (888) JW-ETHIC
Fax: (202) 646-5199 • email: info@judicialwatch.org • Web Site: www.JudicialWatch.org

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 3

compact disks, digital video disks, microfiche, microfilm, motion pictures, pictures, photographs, or videotapes; (4) any graphic materials and data compilations from which information can be obtained; (5) any materials using other means of preserving thought or expression; and (6) any tangible things from which data or information can be obtained, processed, recorded, or transcribed. The term "record" also shall mean any drafts, alterations, amendments, changes, or modifications of or to any of the foregoing.

**If you do not understand this request or any portion thereof, or if you feel you require clarification of this request or any portion thereof, please contact us immediately at 202-646-5172.**

If any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen,* 484 F.2d 820 (D.C. Cir. 1973), *cert. denied,* 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

**Judicial Watch, as a member of the news media, hereby requests expedited processing of this request, pursuant to 28 C. F. R. § 16.5(d)(ii)(iv).**

**Judicial Watch also hereby requests a waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii).**

Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media. Judicial Watch, Inc. regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and publishes and disseminates these works to the public. It intends to do likewise with the records it receives in response to this request.

As a member of the news media, Judicial Watch uses the following means, among others, to publish and disseminate its distinctive work to the public:

(1)     Judicial Watch maintains an Internet site, www.JudicialWatch.org, where the public can review records obtained through FOIA and read editorial works prepared by Judicial Watch, Inc., including news releases, based on FOIA materials. This website is viewed by over 20,000 people per day on average, and on several occasions, has logged up to 1,000,000 visitors in a single day.

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 4

(2)    Judicial Watch also publishes a monthly newsletter in which it publishes its own
editorial works and presents, analyzes, and explains information it obtains through FOIA.
Judicial Watch, Inc.'s newsletter is sent to approximately 140,000 individuals each
month. The organization also utilizes an e-mail Infonet service that sends out updates of
Judicial Watch's activities over the Internet to almost 14,00 persons.

(3)    Judicial Watch also periodically publishes and disseminates its own distinct
works in the form of books and reports. For example, in September 1998 Judicial
Watch, Inc. published the *Interim Report on Crimes and Other Offenses Committed by
President Bill Clinton Warranting His Impeachment and Removal from Elected Office*.
This 145-page report was accompanied by nearly 4,000 pages of supporting
documentation and was crafted, in part, from the raw materials obtained by Judicial
Watch through FOIA requests, among other regular means. In August 1999, Judicial
Watch published *Filegate Status Report*, which is 136 pages long and is supported by
nearly 1000 pages of documentation. In March 2001, Judicial Watch, Inc. published *The
Judicial Watch Florida Recount*, an independent, non-partisan analysis of the results of
Florida's hotly contested 2000 Presidential election based upon an sampling of ballots
reviewed by Judicial Watch pursuant to Florida's version of FOIA. In February 2002,
Judicial Watch published *The Judicial Watch 2002 "State of the Union" Report, Bush
Administration Ethics Enforcement: "A Failure of Leadership."* In September 2002,
Judicial Watch, Inc. published *Fatal Neglect: The U.S. Government's Continuing
Failure to Protect American Citizens from Terrorists*. Most recently on November 21,
2003, Judicial Watch produced *Analysis of GAO Testimony: US Postal Service – Clear
Communication With Employees Needed Before Reopening of Brentwood Facility*.
(GAO-04-2057T/October 23, 2003). Comptroller General of the United States David M.
Walker, in a reply to Judicial Watch's *Analysis of GAO Testimony*, wrote on December
17, 2003, "We view Judicial Watch as an important accountability organization in
Washington, D.C." On February 16, 2005 Judicial Watch was rated by the highly
respected capitol newspaper *The Hill* as being one of the nation's top ten "watchdogs."
Most recently, on June 29, 2005, Judicial Watch produced a special report US Border
Patrol Survey Analysis, a report of an analysis of documents produced under FOIA.

Judicial Watch also publishes and disseminates its distinctive work by participating in
public conferences and seminars, including its own "Ethics in Government" conferences held in
Pasadena, California (1999), Washington, DC (2000), and Miami, FL (2001). Judicial Watch
also works with other media organizations to publish and disseminate distinctive work to the
public, and representatives of Judicial Watch appear frequently on nationally broadcast television
and radio programs. Judicial Watch has been granted press credentials at a number of national
conventions and other events.

Consequently, Judicial Watch qualifies for a waiver of search fees as a member of the
news media. *See National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381, 1387

03/30/2006 18:03 FAX 202 646 5199        JUDICIAL WATCH, INC.                    ☒009/015

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 5

(D.C. Cir. 1989). In fact, Judicial Watch has been recognized as a member of the news media in other FOIA litigation. *See Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000).

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

> shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch ongoing efforts to monitor the operations and activities of the federal government and to educate the public about these operations and activities, and, in particular, as part of an investigation into the facts and circumstances surrounding the President's authorization of the NSA to conduct eavesdropping on the American public without consulting the proper courts under the Foreign Intelligence Surveillance Act (hereafter "FISA").

Courts applying the "public interest" fee waiver provision of FOIA typically take into account four factors in determining whether to grant a waiver: (1) whether the subject of the requested records concerns the operations or activities of government; (2) whether disclosure of the requested records is likely to contribute to an understanding of government operations or activities; (3) whether disclosure of the requested records will contribute to a "reasonably broad" audience and whether the requestor has the "ability and intention" to disseminate the information to the public; and (4) whether disclosure of the requested record will contribute "significantly" to the public understanding. *See D.C. Technical Assistance Org. v. HUD*, 85 F. Supp.2d 46, 48-49 (D.D.C. 2000); 28 C.F.R. § 16.11(k)(2)(i)-(iv). Request for "public interest" waivers are to be judged on a case-by-case basis." *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988).

Without question, the subject-matter of the request concerns the operations and activities of government, namely the legal decision made by the President to authorize such domestic spying and wiretapping, circumventing the FISA court.

Disclosure of the requested records is likely to contribute to an understanding of government operations and activities and will appeal to a "reasonably broad" audience because

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 6

the records relate directly to the facts and circumstances surrounding the legal decision to
authorize or allow such domestic spying.

Indeed, the taxpaying American public deserves full disclosure of the facts and
circumstances surrounding the Bush Administration's decision, which has cause nation-wide
controversy, over his administration's decision to allow and or conduct such spying on American
phone lines. Legal scholars have charged that the administration decision is the most striking
example of executive overreach, claiming that the surveillance being conducted should rightly be
approved by the FISA court giving normal due-process to American citizens and others whose
communications may be monitored by the NSA and passed on to other law enforcement
agencies. The decision which is the subject of this requested disclosure of records is currently a
national news story which has dominated headlines for days. It is obviously a concern to more
than a "reasonably broad" section of the American public, all of whom enjoy constitutional
protection and presumption of innocence in their communications over the phone and elsewhere
with regard to government searches. This disclosure will undoubtedly "significantly enhance"
their understanding of this particular operation and activity of government, by demonstrating how
these decisions regarding the wiretapping of phone calls was made.

Expedited Processing of this request is clearly warranted in light of the widespread public
and media attention being given to this story, because of the questions of the governments
integrity with regards to the constitutionality of these actions, and which effects public
confidence.

Once Judicial Watch obtains the requested records, it intends to analyze them and
disseminate the results of its analysis, as well as the records themselves, as a special written
report. Judicial Watch will also educate the public via radio programs, Judicial Watch's website,
and/or newsletter, among other outlets. It also will make the records available to other members
of the media or researchers upon request. Judicial Watch has a proven ability to disseminate
information obtained through FOIA to the public, as demonstrated by its long-standing and
continuing public outreach efforts, including radio and television programs, website, newsletter,
periodic published reports, public appearances, and other educational undertakings.

Finally, disclosure of the requested records will contribute significantly to the public's
understanding because relatively little is known about the program in question. The records
requested by Judicial Watch undoubtedly will shed additional light on this important matter.

**In accordance with 28 C. F. R. § 16.5 (d)(1)(3), Judicial Watch certifies to be true
and correct to the best of its knowledge and belief that it has, as a member of the media, a
compelling "urgency to inform the public about an actual or alleged federal government
activity,"** *see* **28 C. F. R. § 16.5 (d)(1)(ii). Additionally this is "on a matter of widespread**

Judicial Watch, Inc. FOIA Request
January 6, 2006
Page 7

**and exceptional media interest in which there exists possible questions about the government's integrity which affect public confidence" 28 C. F. R. § 16.5 (d)(1)(ii).**

Given these compelling circumstances, Judicial Watch is entitled to a public interest fee waiver of both search costs and duplication costs. Nonetheless, in the event our request for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to $350.00 in search and/or duplication costs. Judicial Watch requests that it be contacted before any such costs are incurred, in order to prioritize search and duplication efforts.

We look forward to receiving the requested documents and a waiver of both search and duplication costs within ten (10) business days.

Sincerely,

JUDICIAL WATCH, INC.

Christopher J. Farrell

CJF/mac

# EXHIBIT TWO

**U.S. Department of Justice**

Civil Division

---

*Washington, D.C. 20530*

JMK:jk:145-FOI-8607        January 31, 2006



Christopher J. Farrell, Esq.
Judicial Watch
501 School Street, SW, 5th Floor
Washington, D.C. 20024

Dear Mr. Farrell:

This letter responds to your January 6, 2006 request made pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. §552, for all records concerning, relating, or reflecting the following subjects:

1) All legal opinions and/or memoranda regarding authorization by President Bush for the National Security Agency (NSA) to monitor domestic communications without court-approved warrants; and

2) A presidential order signed in 2002 allowing and/or instructing the NSA to monitor domestic communications without court-approved warrants.

Pursuant to your request, we contacted all Directors as well as the Deputy Assistant Attorney General and asked that they advise us of any records responsive to your request maintained by their offices. As a result of these searches, we determined that the Civil Division has no records responsive to your request.

-2-

    If you have questions regarding this response, please
contact me at (202) 514-3319 or Jean Kornblut of my staff at
(202) 514-2319.


                    Sincerely,

                    James M. Kovakas

                    James M. Kovakas
                    Attorney In Charge
               FOI/PA Office, Civil Division

**U.S. Department of Justice**

Civil Division

---

*Washington, D.C. 20530*

JMK:jk:145-FOI-8607                    January 18, 2006

Christopher J. Farrell, Esq.
Judicial Watch
501 School Street, SW, 5th Floor
Washington, D.C. 20024



Dear Mr. Farrell:

This letter acknowledges receipt of your January 6, 2006 request made pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. §552.

We received your request in this office on January 9, 2006 and assigned control number 145-FOI-8607 to your request.

Pursuant to your request for expedited processing, I reviewed your request under departmental regulations at 28 CFR 16.5(d). As a result of my review of your request, I grant you expedited processing of your request pursuant to 28 CFR 16.5(d)(1)(iv).

Sincerely,

James M. Kovakas
Attorney In Charge
FOI/PA Office, Civil Division

TOTAL P.04

EXHIBIT E

**U.S. Department of Justice**

Civil Division

---

*Washington, D.C. 20530*

JMK:jk:145-FOI-8607                April 13, 2006

Christopher J. Farrell, Esq.
Judicial Watch
501 School Street, SW, 5th Floor
Washington, D.C. 20024

Dear Mr. Farrell:

This letter supplements our response to your January 6, 2006 request made pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. §552, for all records concerning, relating, or reflecting the following subjects:

1) All legal opinions and/or memoranda regarding authorization by President Bush for the National Security Agency (NSA) to monitor domestic communications without court-approved warrants; and

2) A presidential order signed in 2002 allowing and/or instructing the NSA to monitor domestic communications without court-approved warrants.

Pursuant to your request, we conducted another search for responsive documents. Our cutoff date for our search is March 17, 2006. As a result of this renewed search, we identified the following documents.

1. Documents which originated with the Office of Public Affairs and Office of the Attorney General consisting of:

a. The NSA Program to Detect and Prevent Terrorist Attacks: Myth v. Reality, January 27, 2006;

b. Prepared Remarks for Attorney General Alberto R. Gonzales at the Georgetown University Law Center;

c. Questions and Answers (Sen. Feingold and Attorney General

-2-

Gonzales).

These documents originated with offices for which the Office of Information and Privacy has responsibility for purposes of responding to record requests under the FOIA. Accordingly, I have referred these documents to that office for disclosure determinations and direct response to you. The contact information is as follows:

> Melanie Ann Pustay, Deputy Director
> Office of Information and Privacy
> Department of Justice
> Suite 11,050
> 1425 New York Avenue, N.W.
> Washington, DC 20530-0001.

2. Documents originating with the Office of Legal Counsel (OLC):

> a. January 19, 2006 White Paper;
>
> b. Draft of White Paper;
>
> c. Draft of Prepared Statement of Hon. Alberto R. Gonzales, Attorney General of the United States;
>
> d.  Draft Response to Questions From Chairman Spector;
>
> e.  Email from OLC.

We have referred these documents to the Office of Legal Counsel for disclosure determinations and direct response to you. The contact information for the Office of Legal Counsel is:

> Elizabeth Farris, Supervisory Paralegal
> Office of Legal Counsel
> Department of Justice
> Room 5515, 950 Pennsylvania Avenue, N.W.
> Washington, DC 20530-0001.

3. Email originating with the Office of Intelligence and Policy Review (OPIR).

We are referring this communication to OPIR for a disclosure

-3-

determination and direct response to you.  The contact
information is as follows:

> GayLa D. Sessoms, FOIA Coordinator
> Office of Intelligence Policy and Review
> Department of Justice
> Room 6150, 950 Pennsylvania Avenue, N.W.
> Washington, DC 20530-0001
> (202) 514-5600.

4.  We identified one internal Civil Division electronic
communication consisting of a January 13, 2006 Email from a Civil
Division attorney commenting on a draft of the White Paper.

This document is an internal Civil Division communication
which falls within the inter-agency requirement for withholding
under 5 U.S.C. §552(b)(5), and is exempt based upon the attorney
work product, attorney-client, and deliberative process
privileges incorporated within this exemption.

This letter constitutes the final action this office will
take concerning your request.  Because you have filed a lawsuit
regarding your request, administrative appeal rights are not
being provided.

> Sincerely,
>
> James M. Kovakas
> Attorney In Charge
> FOI/PA Office, Civil Division